[No. 60281-6. En Banc. March 31, 1994.]

FRANK B. LYNOTT, ET AL, *Respondents*, v. NATIONAL
UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,
*Petitioner*.

*Culp, Guterson & Grader*, by *Bradley D. Stam* and *Robert M. Sulkin*, for petitioner.

*Zelle & Larson, Sandra Wallace*, and *Michelle K. Enright*; *Hallmark, Keating & Abbott, P.C.*, and *William E. Fitzharris, Jr.*, for respondents.

BRACHTENBACH, J. — Defendant National Union Fire Insurance Company of Pittsburgh, PA. (National Union) issued a Directors and Officers Liability and Corporation Reimbursement insurance policy with Tacoma Boatbuilding Company (TBC) as the named insured. The limit of liability was $10 million; the 1-year premium was $145,500. The policy was effective from October 1, 1984, to October 1, 1985 (policy period). Clerk's Papers, at 81.

The individual Plaintiffs herein were directors and/or officers of TBC during the policy period. A lawsuit was brought against a number of Defendants, including individuals who are now Plaintiffs herein, claiming liability for numerous alleged wrongful acts and omissions while acting as directors and/or officers of TBC and arising from the sale of TBC stock to 21 investors. National Union denied coverage and refused to defend.

Employers Insurance of Wausau had provided director and officer liability insurance to TBC for the period September 17, 1981, to September 17, 1984. Coverage was later

extended by endorsement to October 1, 1985, but only with respect to any wrongful act committed before October 1, 1984. Because of a possible overlap in coverage, Wausau advanced approximately $4.9 million to Plaintiff directors/officers under a Loan Receipt and Assignment with a reservation of rights. Plaintiff directors/officers assigned their claims against National Union to Employers Insurance of Wausau.

Plaintiffs sued for damages arising from National Union's denial of coverage and refusal to defend and settle the litigation against them. National Union raised numerous defenses, including a policy exclusion defense. Both sides moved for summary judgment. The trial court granted summary judgment to National Union based on the policy exclusion. The Court of Appeals reversed in an unpublished opinion. *Lynott v. National Union Fire Ins. Co. of Pittsburgh, PA.*, noted at 68 Wn. App. 1033 (1993). We affirm the Court of Appeals.

We briefly summarize the background facts. Tacoma Boatbuilding Company was having financial difficulties; it needed an infusion of cash. Through a broker, TBC was put in contact with Midland Capital Corporation, a business development corporation from New York. Eventually, Midland Capital sought persons and entities to become investors in TBC. In December 1984 and January 1985, agreements for the sale of TBC stock were entered into between TBC and a subsidiary of TBC and 21 investors. These agreements will be referred to as the January 1985 purchase. Those investors purchased approximately 61 percent of the stock of TBC. No single investor acquired a majority of the outstanding stock of TBC. The largest percentage, 14.9 percent, was purchased by a limited partnership. The purchasers were individuals, limited partnerships, trusts, and corporations. Each purchaser warranted and she/he/it was purchasing for her/his/its own account and for investment purposes. Clerk's Papers, at 675-757.

Later litigation was started by the investors. They sued directors/officers of TBC, among others, alleging wrongful

acts and omissions in connection with the sales of stock to the investors, and losses therefrom.

The National Union directors and officers liability policy contained endorsement 12 which reads as follows:

> In consideration of the premium charged, it is hereby understood and agreed that the insurer shall not be liable to make any payment for any claim or claims made against Directors and Officers arising out of any merger, acquisition or divestiture or any merger, acquisition or divestiture negotiations, or any attempted merger, acquisition or divestiture negotiations involving the insured, any other entity any/or [*sic*] individual, including but not limited to all subsequent shareholder derivitive [*sic*] or representative actions resulting therefrom.

Clerk's Papers, at 100.

Stated generally, the issue is whether the stock purchases under the January 5, 1985, agreement by the 21 investors was an "acquisition" involving TBC within the terms of endorsement 12. More specifically, National Union argues that (1) extrinsic evidence shows a mutual intent by it and TBC to exclude the January 1985 transaction as an "acquisition" within the terms of endorsement 12, and (2) the word "acquisition" in the policy is not ambiguous, claiming that it has ordinary meaning within which the January 1985 purchases fell.

We hold: (1) The *relevant* extrinsic evidence fails to show an objective manifestation of mutual intent as to the meaning of "acquisition" or that the January 1985 purchases were specifically excluded from coverage. (2) The word "acquisition" is ambiguous, even under the five different and inconsistent "ordinary" meanings urged by National Union. Therefore, the exclusion is not stated in clear and unequivocal language and must be construed strictly against the insurer.

Before considering the extrinsic evidence, we answer National Union's contention in its petition for review that there is confusion concerning the use of extrinsic evidence in interpreting insurance policies and application of rules of interpretation particularly applicable to insurance policies. National Union argues that the Court of Appeals did not

follow the "context" rule of *Berg v. Hudesman,* 115 Wn.2d 657, 801 P.2d 222 (1990).

The confusion, if it exists, is easily dispelled. First, the special and specific rules of interpretation governing the interpretation of insurance policies, some of which are discussed hereafter, were not changed by the *Berg* holding. Second, the holding of *Berg v. Hudesman, supra,* was no revolutionary change in the principles of contract interpretation. *Berg* recognized an inconsistency in prior Washington cases. Some of those cases stated the "plain meaning" principle; other cases used the "context" rule. *Berg* noted that the plain meaning rule has been criticized by the leading scholars, *e.g.,* A. Corbin, S. Williston and J. Wigmore, has been rejected by the Uniform Commercial Code, and is inconsistent with the Restatement (Second) of Contracts. *Berg,* at 666-67.

■■ We held in *Berg* that ambiguity in the meaning of contract language need not exist before evidence of the circumstances surrounding the making of the contract could be admissible. However, we carefully noted the substantial limitation on the purpose and use of such evidence. We repeat part of that holding which was taken from *J.W. Seavey Hop Corp. v. Pollock,* 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944) and which was reaffirmed *specifically* in *Berg,* at 669:

> May we say here that we are mindful of the general rule that parol evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract, in the absence of fraud, accident, or mistake. But, as stated in *Olsen v. Nichols,* 86 Wash. 185, 149 P. 668 [(1915)], parol evidence is admissible to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intention of the parties and properly construing the writing. Such evidence, however, is admitted, not for the purpose of importing into a writing an intention not expressed therein, but with the view of elucidating the meaning of the words employed. Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument. It is the duty

of the court to declare the meaning of what is written, and not what was intended to be written. If the evidence goes no further than to show the situation of the parties and the circumstances under which the instrument was executed, then it is admissible.

*Berg*, at 669 (quoting *Pollock*, at 348-49).

We emphasize the language that "[e]vidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, *and not for the purpose of showing intention independent of the instrument.*" (Italics ours.) *Berg*, at 669 (quoting *Pollock*). The underlying principle is well established and was not changed by *Berg*.

[W]e have long adhered to the objective manifestation theory of contracts. This theory means that we impute to a person an intention corresponding to the reasonable meaning of his words and acts. Petitioner's unexpressed impressions are meaningless when attempting to ascertain the mutual intentions [of the parties].

*Dwelley v. Chesterfield*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977).

The principle is quite simple. Unilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions. *Watkins v. Restorative Care Ctr., Inc.*, 66 Wn. App. 178, 192, 831 P.2d 1085, *review denied*, 120 Wn.2d 1007 (1992). "[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention." Restatement (Second) of Contracts § 212 comment *a* (1965).

One of the practical considerations in applying the context rule to interpreting insurance policies is that it is unusual for the terms of the policy to be negotiated. However, where there are actual negotiations, the context principle, as appropriately limited by its definition, permits admission, and examination of extrinsic evidence. It is within this framework that one must read the rules stated in *Greer v.Northwestern Nat'l Ins. Co.*, 109 Wn.2d 191, 200, 743 P.2d 1244 (1987) and *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993). The Court of

Appeals, contrary to the assertions of National Union, did apply correctly the *Berg* holding and found, as do we, that the *relevant* extrinsic evidence did not show an objectively manifested *mutual* intent to exclude the stock purchases of January 1985.

■ To review the grant of a summary judgment we engage in the same inquiry as the trial court. The applicable rules governing summary judgments need not be repeated. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 811, 828 P.2d 549 (1992).

National Union contends that it was the mutual intent of the insured, TBC, and National Union to exclude specifically from coverage the potential transaction with the investors. When TBC was attempting to secure the coverage, no agreement had been reached with any potential investors. In fact, the early negotiations through Midland Capital contemplated purchase of only 30 percent of TBC's stock.

National Union had no discussions with TBC, its officers or directors concerning the policy or its terms. TBC was represented by its insurance broker, Corroon & Black. The relevant extrinsic evidence consists of one 20-minute meeting between an officer of the insurance broker and the National Union underwriter, and two telephone calls.

In his first declaration, the National Union underwriter made only this conclusory statement: "During the application process, Corroon & Black informed me of the Midland/TBC transaction. That transaction was described to me as an 'acquisition' and as a 'merger' by Corroon & Black." Clerk's Papers, at 1193. In a later declaration, the National Union underwriter refers to a telephone conversation with Larry Corroon. The only specific fact related is: "Larry Corroon told me that Midland wanted to 'acquire' TBC." Clerk's Papers, at 1016. Larry Corroon was not the broker handling the application for TBC. In fact, he was the broker for Midland. There is no showing of what knowledge Larry Corroon had about the potential purchase by the investors, or what he meant by "acquire".

The second telephone conversation was between the Corroon & Black employee who was handling the TBC insurance application and a person in National Union's office, not the underwriter in charge of the application process. The only matter of relevance is that the broker's notes list exclusions "to come", including a "mergers, acquisitions and divestitures" exclusion. There is nothing about specific exclusion of the possible stock purchases or that it was even discussed. Clerk's Papers, at 1005-06.

The only other relevant evidence submitted by National Union is another declaration by the National Union underwriter. He states: "In September, 1984, I had a conversation with William Grant of Corroon & Black in which he described the Midland transaction as an 'acquisition' and 'merger'". Clerk's Papers, at 1016. That single sentence is *all* the evidence the underwriter provides about this critical conversation. It must be noted that the underwriter never asserts that he and Grant discussed specific exclusion of a "merger" (which never was considered) or the "acquisition", nor does he claim that National Union said it would insert a "mergers, acquisition" exclusion.

William Grant, head of Corroon & Black's marketing department in Seattle, was in New York on other business. He was asked by the Seattle office to see if he could help get the insurance. His knowledge of the negotiations with Midland Capital was minimal; he only knew what he learned in a telephone conversation with his Seattle office. Specifically: "The Midlands account or Midlands was purchasing or doing something with Tacoma Boat. . . . they were in the process of doing whatever with Tacoma Boat, buying, whatever. . . . That they were buying the company." Clerk's Papers, at 533-34.

Grant then described his meeting with the National Union underwriter, a meeting of about 20 minutes. He stated:

Q: What did you say to him and what did he say to you?

A: Just — not a whole lot, other than the leaning was that without more information about the Midland involvement,

they probably weren't going to be able to do anything for Tacoma Boat's D&O.

. . . .

A: I don't recall that we got into a lot of discussions about — specific discussions about specific things about the account.

. . . .

Q: Did he ask you any specific questions about Tacoma Boat?

A: No. Not that I recall.

Clerk's Papers, at 537.

Q: Did you feel hopeful after the meeting was over that this might be the potential carrier for TBC's D&O risk?

A: I felt we were going to resolve something if we gave them the documentation they were looking for.

Q: Did you feel it was dependent upon that?

A: Definitely. That was very clear.

Q: Did National Union's representative make that clear?

A: That was very clear to me, yes.

Q: As you sit here today can you recall what document or information the underwriter made reference to?

A: It was something to do with the purchase by Midlands of Tacoma Boat as I — that's all I seem to remember about it.

Clerk's Papers, at 539.

Grant states that he recalled "no discussion with [Mr. Allen, the National Union underwriter] that National Union intended to exclude coverage for the Midland transaction, or that National Union even intended to add a 'mergers and acquisitions' exclusion to the Tacoma Boat policy." Clerk's Papers, at 530. Further: "In my discussions with Mr. Allen, I was never asked what my opinion was as to the character of the Midland transaction." Clerk's Papers, at 530. Grant explained that given his lack of information about the transaction, he believed the National Union underwriter did not and could not rely on Grant to explain the transaction, but rather National Union wanted to review documents about the transaction. Specifically: "Mr. Allen [the underwriter] requested additional information about Tacoma Boat and the Midland transaction which I had sent to me in New York for delivery to National Union. I delivered the material to National Union without reviewing it." Clerk's Papers, at 530.

It is critical to note that the National Union underwriter never claims that he and the insurance broker ever discussed specific exclusion of the investments through Midland Capital. It is clear that National Union fails to establish a mutually manifested intent that the stock purchases then being negotiated were to be excluded from coverage. In its brief, National Union asserts that it was "unwilling to provide coverage for claims arising out of 'any merger, acquisition, or divestiture', *including any claims relating to the Midland transaction.*" (Italics ours.) Brief of Respondent, at 3-4. National Union then cites Clerk's Papers, at 100 as the only support for proof of its intent to exclude specifically the Midland transaction. That cite is only to the exclusion contained in endorsement 12 which does not reference the Midland transaction. Without any other proof, it is a fair inference that the parties did not mutually agree that the Midland transaction was to be excluded.

█ It is highly significant that National Union had available a form endorsement specifically excluding claims arising out of a merger or acquisition involving a particular entity. Clerk's Papers, at 628. National Union did not use that available, standard form endorsement which would have identified with particularity the transaction which it now claims it intended to exclude. "In evaluating the insurer's claim as to meaning of language used, courts necessarily consider whether alternative or more precise language, if used, would have put the matter beyond reasonable question." 13 John A. Appleman & Jean Appleman, *Insurance Law & Practice* § 7403 (1976).

█ There is evidence from both the National Union underwriter and the insurance broker who met with him that National Union would not proceed without written details about the financial condition of TBC and the proposed investments. Clerk's Papers, at 533. In fact, the National Union underwriter declared that "[i]n agreeing to issue D&O insurance to TBC, National Union relied heavily on the financial information provided by TBC." Clerk's Papers, at 1193. What information was provided is not

known. What National Union's file or records reveal about National Union's underwriting decisions is not known. This lack of possibly vital information exists because National Union asserts that it cannot find its underwriting file. Clerk's Papers, at 134. When a party fails to produce relevant evidence within its control, without satisfactory explanation, the inference is that such evidence would be unfavorable to the nonproducing party. *Pier 67, Inc. v. King Cy.*, 89 Wn.2d 379, 385-86, 573 P.2d 2 (1977).

National Union claims other extrinsic evidence is relevant to show mutual intent regarding exclusion of the investors' purchases of stock, but it is not. For example, National Union cites a report of Midland Capital's certified public accountants which referred to the "acquisition" of TBC. That report was made after the policy was in existence and there is no showing that either TBC or National Union had any knowledge of it before this litigation. There is no showing of what the writer meant or the writer's understanding of the term. In any event, it is not relevant to the intent of the parties. Next National Union points to a letter written by the account executive at Corroon & Black who referred to the stock purchases as a merger. National Union fails to disclose that it is obvious that the insurance broker had no comprehension of the meaning of "merger" because he stated that he was referring to "an infusion of capital by Midlands into Tacoma Boat". Clerk's Papers, at 1110.

In fact, the broker at the time of negotiations had not told TBC that the proposed transaction would be excluded from coverage. "[B]ecause I didn't know that it was a merger as such. It was — as far as I knew, it was an infusion of capital some way or other, and I don't know if that constitutes a merger or not." Clerk's Papers, at 511. Again, this bit of evidence is not relevant. The statement was made months after the policy was negotiated and had no bearing on the intent of the parties. It simply is an erroneous statement of fact and a mistaken legal conclusion.

 An interpretation of an insurance clause must be reasonable and take into account the purpose of the insur-

ance at issue. *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992); *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991). This principle makes it difficult to accept National Union's exclusionary interpretation when one considers the premium charged. The National Union policy replaced the Wausau policy. The annual premium for the Wausau policy, which did *not* contain a mergers and acquisitions clause, was $8,645. The National Union annual premium, *with* such exclusion, was $145,500. Thus, National Union unreasonably argues that its policy excluded the only transaction to which it could apply.

We conclude there was no objective manifestation to exclude from coverage the stock purchases which were being negotiated when the policy was issued.

Next we determine whether endorsement 12, which excludes coverage for claims "arising out of any merger, acquisition or divestiture or any merger, acquisition or divestiture negotiations . . . involving the insured [TBC]", is ambiguous. Clerk's Papers, at 100.

▇▇▇▇ The applicable rules are well established in Washington law.

> The focal question is whether the exclusionary language of the policy is ambiguous. This question requires us to interpret the policy's exclusionary language and provisions. " 'Interpretation of a promise or agreement or a term thereof is the ascertainment of its meaning.' " *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990) (quoting Restatement (Second) of Contracts § 200 (1981)). Insurance policy language must be interpreted in accord with the way it would be understood by the average person. *National Union Fire Ins. Co. v. Zuver*, 110 Wn.2d 207, 210, 750 P.2d 1247 (1988). An insurance policy provision is ambiguous when it is fairly susceptible to two different interpretations, both of which are reasonable. *Stanley v. Safeco Ins. Co. of Am.*, 109 Wn.2d 738, 741, 747 P.2d 1091 (1988). If exclusionary language is ambiguous, it is proper to construe the effect of such language against the drafter. *National Union Fire Ins. Co.*, at 210. *See also Berg v. Hudesman*, at 677 (it is proper to construe the legal effect of an ambiguous contract provision against the drafter). Thus, if an insurance policy's exclusionary language is ambiguous, the

legal effect of such ambiguity is to find the exclusionary language ineffective.

*McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992).

 Further, regarding an exclusionary clause: "The rule strictly construing ambiguities in favor of the insured applies with added force to exclusionary clauses which seek to limit policy coverage. *Exclusions of coverage will not be extended beyond their 'clear and unequivocal' meaning.*" (Footnotes omitted. Italics ours.) *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 875, 854 P.2d 622 (1993).

 The National Union exclusion in endorsement 12 refers to "merger, acquisition or divestiture". None of those terms is defined in the policy. There was no merger or divestiture so the focus is on the word "acquisition". Undefined terms are given their "plain, ordinary and popular" meaning. *Farmers Ins. Co. v. Miller*, 87 Wn.2d 70, 73, 549 P.2d 9 (1976). It is appropriate to seek such meaning from standard English dictionaries.

National Union argues that "acquisition" is not ambiguous, but it offers no single definition. In the trial court it asserted that "the definition of *acquisition* incorporates the word 'control,' and *is broader than the concept of 'control'* ". (Italics ours.) Clerk's Papers, at 964. In its brief in the Court of Appeals, it first argued that " 'acquisition' includes any transaction by which a person, group of persons or entity obtains control over another business entity." Brief of Respondent, at 12. National Union then offers a dictionary definition of "to acquire" as meaning "to come into possession or control of", citing *Webster's New Collegiate Dictionary* (1991). Brief of Respondent, at 13.

Thus, National Union argues that "acquisition" is broader than "control", but also means "control" or "possession". However, the more commonly cited *Webster's Third New International Dictionary* sheds a different light. It defines "acquire" as meaning "to come into possession, control, or power of disposal". *Webster's Third New International Dictionary* 18 (1981). National Union overlooks the standard

definition of "possession" which is defined to include "something *owned*". *Webster's,* at 1770.

In this legal context it is helpful to examine legal dictionaries. One defines "acquisition" as "[t]he act of becoming the *owner* of certain property". (Italics ours.) Black's Law Dictionary 24 (6th ed. 1990). Another defines "acquisition" as "[t]hat which is purchased or otherwise brought into one's *ownership,* literally that which is acquired." (Italics ours.) Ballentine's Law Dictionary 16 (3d ed. 1969).

Having offered one dictionary definition, and focusing solely on "control", National Union proceeds to offer five additional definitions. First, it cites RCW 32.32.228 which it asserts defines "acquisition" in terms of "control". It neglects to note that this statute was enacted *after* the policy was issued, relates only to mutual savings banks and is limited to use in that section of the statute. Laws of 1985, ch. 56, § 25. Under that banking statute, 25 percent stock ownership equals control. As will be shown, no stock purchaser here acquired even 25 percent.

National Union next cites RCW 21.20.717 where a controlling person is defined as one who owns, controls, or has power to vote 25 percent or more of voting securities. Again, National Union does not disclose that the definition is limited "[f]or purposes of the provisions of this chapter relating to debenture companies . . .". The statute was passed *2 years after* this transaction and was not effective until January 1988. Laws of 1987, ch. 421, § 3.

Third, National Union cites RCW 23B.19.020 for a definition of "control", omitting the fact that the statute is the hostile takeover statute, passed *after* the policy was issued. Further, the statute provides that "beneficial ownership of ten percent . . . create[s] a presumption [of] control". RCW 23B.19.020(5). Thus, two of National Union's suggested definitions require 25 percent of ownership, control, or power to vote while the third definition creates a presumption of control by beneficial ownership of 10 percent.

In its supplemental brief to this court, National Union additionally cites RCW 33.24.350 where the definition of

control again requires 25 percent, but, by its terms, is limited to savings and loan associations.

Finally, as part of what it claims to be "common usage", National Union cites 15 U.S.C. § 78m(d)(1), a section of the Securities Exchange Act of 1934. We seriously doubt that a subsection of a section of the securities exchange act is in common usage and known to the average purchaser of insurance.

■ The fact that National Union has to resort to technical, statutory definitions limited to legal entities not here involved, most of which were enacted after issuance of the policy, underscores the lack of a commonly known definition contemplated by the average purchaser of insurance. "[B]efore an insurance company can avail itself of a legal technical meaning of a word or words, it must be clear that *both* parties to the contract intended that the language have a legal technical meaning." *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 882, 784 P.2d 507, 87 A.L.R.4th 405 (1990).

Plaintiffs argued that National Union suggested definitions showed an ambiguity because several required 25 percent and another 10 percent. National Union's answer reveals the fundamental weakness in its position. It stated that plaintiffs' argument "might be persuasive if the Midland Group bought 20% of the shares of TBC or if there were any uncertainty as to whether the Midland Group obtained control over the company. However, here, Midland bought 61.9% of TBC and clearly obtained and exercised control." Brief of Respondent, at 23. There is no "Midland Group" named in the purchase document. None exists. We note that at one point National Union refers to the Midland Group and at another to Midland. As shown, there were 21 purchasers. There was no entity known as "Midland". National Union's argument collapses under the facts.

■ According to the dictionaries, the term "acquisition" may mean *ownership*, possession, *or* control. Possession may also mean ownership as contrasted to control. Ownership is different from control. Each is a reasonable construc-

tion of an ambiguous term. We repeat: "Exclusions of coverage will not be extended beyond their *clear and unequivocal* meaning". (Footnote omitted. Italics ours.) *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 875, 854 P.2d 622 (1993).

Application of that rule is particularly justified here where (1) National Union did not define the term "acquisition" even though it was aware of the pending negotiations, and (2) National Union had a standard form clause which would have excluded specifically the subject transaction by merely inserting a description of the potential investors or the transaction in general. It is the burden of the insurer to draft an exclusion in clear and unequivocal terms. Instead, National Union chose to use an undefined term. It offers five different and internally inconsistent statutory definitions, most passed after issuance of the policy.

Applying the relevant rules of construction, we construe "acquisition" to include "ownership". That is one reasonable, alternative construction, and it is not synonymous with "control".

This leads to an analysis of the transaction involving purchase of TBC stock in 1985. As noted, National Union constantly refers to the purchaser as "Midland" or the "Midland Group". The facts are otherwise. The purchase agreement names Midland Venture Capital Limited, Midland Capital Corporation and 19 other persons or entities as the investors. Clerk's Papers, at 679. There is no mention of a Midland Group or Midland alone. Some investors purchased as few as 7,500 shares, others 12,500 shares. By the terms of the agreement of purchase, no single person or entity acquired a majority of TBC stock. Midland Capital acquired only 9.05 percent; the largest single entity acquisition was by a limited partnership which acquired 14.9 percent.

It is a reasonable interpretation of "acquisition" in the exclusionary clause that ownership of a majority of a corporation's stock by a single entity is necessary to constitute an acquisition. An assumed set of facts shows the unreasonableness of the interpretation offered by National

Union. If 51 investors separately bought 1 percent of the shares of a corporation, under National Union's interpretation there would be an acquisition. Obviously, no one investor "acquired" the corporation in the sense of ownership. Here no one investor "acquired" TBC in terms of ownership.

To meet this argument, National Union argues that "own", "possession", and "control" have substantially the same meaning. Supplemental Brief of Petitioner, at 8. As authority for that position, it cites *Cooper Dev. Co. v. First Nat'l Bank*, 762 F. Supp. 1145 (D.N.J. 1991). That case is not relevant to the issue here. It involved interpretation of the New Jersey Environmental Cleanup and Responsibility Act, and a relationship between a parent and its subsidiary. The holding is premised entirely on published "remarks" of a state agency as to who is an "owner" within the statute. It bears no possible relationship to this case.

An examination of the other authorities cited by National Union demonstrates a complete lack of authority for its interpretation of "acquisition". It cites *Bath Indus., Inc. v. Blot*, 427 F.2d 97 (7th Cir. 1970). There the court's interpretation was specifically limited to a federal statute. It did not involve an insurance clause and did not provide a general definition of "acquisition". Likewise, citing *Marin Cy. v. United States*, 356 U.S. 412, 2 L. Ed. 2d 879, 78 S. Ct. 880 (1958) lends no support to National Union's position. That interpretation related only to jurisdiction under the Interstate Commerce Act.

National Union's reliance on these irrelevant case interpretations lends substantial weight to the conclusion that "acquisition" is ambiguous. Certainly use of that word without definition is not an expression of an exclusion in clear and unequivocal language. We reject National Union's argument that ownership and control are synonymous. Neither the dictionary definitions nor relevant case authority supports that conclusion.

This leaves only National Union's contention that the 21 investors acted in concert. Apparently National Union equates acting in concert with control. It cites no relevant

authority for that proposition. There is no doubt that acting in concert is not the same as ownership and the argument fails on that ground alone. In any event, there is no proof of a concerted plan or joinder by the 21 separate investors. The only relevant evidence is the written declarations by each investor that he/she or it was acquiring the shares for his/her or its own account.

National Union relies heavily on a voting trust agreement to show that somehow it changed the separate purchases into an "acquisition" within the meaning of the exclusion. We must keep in mind the insurer's burden on this issue and the rule of construction against it in light of the ambiguity of the word *it* chose to express its intention. The voting trust agreement granted voting rights to some, but not all, the shares of the separate investors. National Union asserts that the voting trust agreement was irrevocable. Brief of Respondent, at 41. That is demonstrably false. The voting trust provided for its termination on December 1, 1986, and *earlier* if the stock were registered with the Securities and Exchange Commission, or if the two trustees resigned, died or ceased to be directors of TBC. Clerk's Papers, at 1829.

Under the voting trust, the investors specifically retained ownership of their stock, except for the limited right to vote those shares in the trust which was not all of the stock held by the investors, and except for the right to sell while the trust remained in existence. *The voting trust could have been terminated by events over which the investors had no control.* It is obvious that if a reasonable interpretation is given to "acquisition", it carries a more permanent connotation. An example again illustrates the unrealistic and unreasonable nature of National Union's argument. Under its theory there would be an acquisition if the owner of 1 percent of a corporation's shares acquired proxies for an additional 49 percent, solely to vote at the annual meeting. That is not a reasonable meaning of "acquisition".

The new investors did appoint four of the seven directors of TBC, two named by Midland Capital Corporation and Midland Venture Capital Limited, and two by the remain-

ing investors. There remained three prepurchase TBC directors. Those three directors, plus one named by the purchasers, would constitute a majority. Under National Union's theory that group would be in control and that control would constitute an "acquisition". Such cannot be the meaning of the exclusion. Additionally, *all* the directors had a fiduciary duty to *all* the shareholders, not just the 21 investors. RCW 23B.08.300. There were shareholders of TBC stock, other than the 21 investors, who held 4,365,368 shares. Clerk's Papers, at 683. There is no showing that the four investor-named directors had any plan to act in concert. There is no showing that they intended to represent only the 21 investors. Indeed, by law, they had to exercise good faith toward all shareholders, including those holding the more than 4 million shares over which they had no control at all. This is too tenuous to constitute "control" of TBC and there is no doubt that it is not the equivalent of *ownership* of TBC.

In summary, first, National Union failed to show a mutual intent to exclude the specific transaction by the language of endorsement 12. At most, it showed its undisclosed, unilateral intent. Second, the word "acquisition" is ambiguous for the reasons stated above. This leads to application of the rule that "if an insurance policy's exclusionary language is ambiguous, the legal effect of such ambiguity is to find the exclusionary language ineffective." *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992).

The trial court is reversed and the Court of Appeals is affirmed.

UTTER, DOLLIVER, SMITH, and JOHNSON, JJ., concur.

GUY, J. (dissenting) — If an insurance contract is clear and unambiguous, it must be enforced as written. This court should not modify clear and unambiguous language or revise an insurance contract under the theory of construing

it. *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993); *Britton v. Safeco Ins. Co. of Am.*, 104 Wn.2d 518, 528, 707 P.2d 125 (1985). Nothing in the language of endorsement 12 indicates that it or the word "acquisition" is ambiguous. To the contrary, its purpose is clear. Its language is direct. Endorsement 12 reads as follows:

> In consideration of the premium charged, it is hereby understood and agreed that the insurer shall not be liable to make any payment for any claim or claims made against Directors and Officers arising out of any *merger, acquisition or divestiture* or any merger, acquisition or divestiture negotiations, or any attempted merger, acquisition or divestiture negotiations involving the insured, any other entity any/or [*sic*] individual, including but not limited to all subsequent shareholder derivitive [*sic*] or representative actions resulting therefrom.

(Italics mine.) Clerk's Papers, at 100. The plain language of endorsement 12 informs the average policyholder that no insurance coverage exists for any claim associated with a merger, acquisition or divestiture. The "plain, ordinary, and popular" definition of "acquisition" under the facts and circumstances of this case is: the purchase of stock in a target company whereby the acquiring entity gains control or comes into possession of the target company. Here, the negotiated purchase of 61 percent of TBC's stock by 21 investors, all of whom participated in a voting trust, allowed the investors to control TBC and constitutes an acquisition. Under endorsement 12 any claim relating to any acquisition is not covered. This case involves a claim relating to an acquisition and endorsement 12 does not provide coverage. The majority holds otherwise, and I respectfully dissent.

The word "acquisition" is not defined in the National Union insurance policy. Undefined terms in an insurance contract are given their "plain, ordinary, and popular" meaning. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507, 87 A.L.R.4th 405 (1990). To ascertain the ordinary meaning of a word, Washington courts look to standard English dictionaries. *Boeing*, at 877; *Estate of Jordan v. Hartford Accident & Indem. Co.*, 120 Wn.2d

490, 502, 844 P.2d 403 (1993). A legal or technical meaning of a word must not be used by a court unless it is clear to both parties that a legal or technical meaning was intended. *Boeing*, at 882. Absent mutual intent, an undefined word must be given its ordinary meaning.

A standard English dictionary defines "acquisition" as "the act or action of acquiring". *Webster's Third New International Dictionary* 19 (1986). "Acquire", in turn, means "to come into possession, control, or power of disposal". *Webster's*, at 18. Importing the plain, ordinary and popular meaning of acquisition into the National Union insurance policy, paying close attention to the context in which the word "acquisition" was used, *i.e.*, "merger, acquisition, or divestiture", acquisition means: the purchase of stock in a target company whereby the acquiring entity gains control or comes into possession of the target company. Here, four facts: the stock purchase agreement, the TBC bylaws, the voting trust, and a confidential Midland Capital memorandum, support the conclusion that the 21 investors acquired TBC.

The stock purchase agreement evidences that the investors acted as a group and with the purpose of obtaining a controlling interest in TBC. On January 4, 1985, Midland Capital Corporation, Midland Venture Capital Limited, and 19 other investors (hereinafter collectively referred to as "the investors") purchased 61 percent of TBC stock pursuant to a 51-page negotiated stock purchase agreement. This agreement with TBC was signed by all 21 investors and it mandated that the stock purchase take place on a single closing date. In the agreement, TBC made numerous warrants and promises. For example, TBC warranted that (1) there were no outstanding options, calls, or rights to purchase common stock; (2) all property was free and clear from any mortgages or liens; (3) no litigation was pending which could adversely affect the company; (4) all laws and taxes had been complied with and paid; and (5) the company had title to all property. Similar warrants were made by At-Sea Incineration, Inc., TBC's only subsidiary. Furthermore, all investors made

similar warrants to TBC, an act evidencing an acquisition more than a mere purchase of stock.

The TBC bylaws also support the opinion that the investors controlled TBC. The bylaws declare that seven people shall sit on the Board of Directors (Board) and that the Board is vested with the general power to manage TBC. The Board selects the chief executive officer, president, vice president, secretary and treasurer of TBC, all of whom serve at the pleasure of the Board. The president controls the day-to-day operations of TBC. The negotiated stock purchase agreement provided that the investors had the power to appoint four new members to the 7-member TBC Board. The investors controlled the Board and the investors controlled TBC.

The voting trust, a contract between the investors, indicates that the investors acted in concert. Most importantly, the voting trust agreement was signed by all the investors. It was irrevocable at the discretion of any investor and was applicable to all heirs, assignees and transferees. The managing directors of Midland Capital and Midland Venture were named in the trust agreement as trustees. The voting trust controlled 61 percent of the outstanding shares of TBC and it gave the two trustees absolute power to vote all 61 percent of those shares.

> While this Trust Agreement is in effect, the Trustees, in their unrestricted discretion, in person, by proxy or by written consent, jointly or singly, shall have the full and unqualified right and power to vote the Shares for the election of any person or persons (including the Trustees) as directors of the Company, to waive notice of meetings of stockholders of the Company and otherwise to act in connection with the voting of the Shares in the same manner and to the same extent as if they were the absolute owner thereof in their own right. On all other proposals or matters . . . the Trustees shall be entitled to vote the Shares, for or against such proposal or matter, or to refrain from voting, as they, in their sole discretion shall determine.

Clerk's Papers, at 762. Although the voting trust was initially set to expire after 2 years, the trust could terminate prior to the 2-year period if the TBC shares were registered

under the Securities Exchange Act of 1934, both trustees died, or a trustee did not sit on the TBC Board. These contingent events, however, do not destroy the voting trust.

A confidential Midland Capital Corporation memorandum dated September 1984 announced: "We are purchasing *control* of a company which has simultaneously experienced labor, management, volume, pricing, developmental, and confidence problems." (Italics mine.) Clerk's Papers, at 866. The memorandum also states that it is the intention of the trustees to "spin-off" At-Sea Incineration, Inc., to make their investment more profitable:

> The Company's earnings have been penalized by the carrying costs of At-Sea Incineration, Inc. We intend to spin-off At-Sea, thereby reducing the earnings drag and the management divergence created by At-Sea. . . . We believe the spin-off may create an opportunity among investors to recoup a portion of this investment if they so desire.

Clerk's Papers, at 867. The confidential memorandum is further evidence that the investors wanted control of TBC and that they acted in concert to obtain that control.

The majority holds the word "acquisition" ambiguous and defines "acquisition" as follows: "*ownership* of a majority of a corporation's stock by a *single entity*". (Italics mine.) Majority, at 694. I disagree with the majority's conclusion that the word "acquisition" is ambiguous. I also disagree with the majority's application of the facts in this case to its definition of "acquisition". The majority mistakenly concludes that a change in ownership did not occur and erroneously holds that the investors did not act as a single entity or in concert when they purchased 61 percent of TBC's stock.

The majority erred when it extended the definition of "acquisition" to include ownership. Ownership was brought into the equation when "acquisition" was defined with a legal dictionary. Acquisition is "[t]he act of becoming the owner of certain property". Black's Law Dictionary 24 (6th ed. 1990). Majority, at 692. The use of a legal dictionary, which by title and common sense indicates that it will contain a legal or technical meaning, is inappropriate unless the party propos-

ing the legal definition proves that it was clear to both parties that a legal meaning was intended. *Boeing*, 113 Wn.2d at 882. Here, the majority found that no mutual intent exists with respect to the meaning of "acquisition". Majority, at 682. Notwithstanding the *Boeing* rule, the majority gives "acquisition" a legal definition. This is error; Black's Law Dictionary is not a standard English dictionary. In *Huddleston v. United States*, 415 U.S. 814, 39 L. Ed. 2d 782, 94 S. Ct. 1262 (1974), the Supreme Court interpreted a federal firearm statute that employed the word "acquisition". The Court interpreted the statute and held that "acquisition", as used in 18 U.S.C. § 922(a)(6), is not ambiguous. *Huddleston*, at 823. It defined "acquire" using a standard English dictionary as " 'to come into possession, control, or power of disposal of.' " *Huddleston*, at 820 (quoting *Webster's New International Dictionary* (3d ed. 1966)). Consequently, the majority inappropriately created an ambiguity by importing a legal meaning into the "plain, ordinary, and popular" meaning of the word "acquisition". If ownership is removed from the majority's definition, acquisition is defined as control, and the evidence overwhelmingly supports the conclusion that the investors controlled TBC.

Arguendo, if the facts are to be construed to establish the requisite mutual intent for the use of a technical or legal definition, a technical meaning should not come from a legal dictionary, but rather from an expert in the field, a hornbook, or a legal textbook. Chapter 13 in Soderquist & Sommer's corporate law textbook is entitled "Mergers and Acquisitions". Larry D. Soderquist & A. A. Sommer, Jr., *Understanding Corporation Law* 233 (1990). In the first paragraph of this chapter, the authors acknowledge that "[t]he title is . . . a misnomer, because mergers and acquisitions are not two different things. Mergers are simply one form of acquisition." L. Soderquist & A. Sommer, at 233. Thereafter, the authors highlight the various forms of acquisitions: mergers, consolidations, as-set *acquisitions, tender offers, and negotiated purchases of stock*. L. Soderquist & A. Sommer, at 233-38. If this textbook definition of "acquisition" were applied, an acquisition

occurred because the investors purchased their TBC shares pursuant to a 51-page negotiated stock purchase agreement.

Furthermore, the word "acquisition" should not be ruled ambiguous on the basis that it can be defined by two nonsynonymous terms. Ownership and control are coextensive terms and may both be used to define "acquisition" without rendering the word ambiguous. If the majority's holding is that words having a range of acceptable and reasonable meanings are by reason thereof ambiguous, all words would then have the potential to be construed as ambiguous. It would therefore be impossible to enter into a contract without defining every word, and even then those definitions would be subject to an ambiguity interpretation.

If ownership and control are both incorporated into the definition of acquisition, the majority erred when it held that a change in ownership did not occur. On January 3, 1985, TBC was owned 100 percent by prenegotiated stock purchase agreement shareholders. On this same date, the investors owned 0 percent of TBC. On January 4, 1985, this equation materially changed. Pursuant to the stock purchase agreement, the investors purchased approximately 7,373,500 shares of TBC, a 61 percent interest. As a result, the prenegotiated stock purchase agreement shareholders' ownership diminished from 100 percent to 39 percent. Thus, a 61 percent change in ownership occurred on January 4, 1985. To hold otherwise ignores the stock purchase agreement and the effect it had on the prenegotiated stock purchase agreement shareholders.

I also take issue with the majority's definition of "acquisition" because it would require *one entity* to purchase a majority of the TBC shares. The majority holds that because the voting trust did not own the shares, it is not an entity for purposes of determining whether any group had control over TBC. A group for purposes of the Securities Exchange Act of 1934 need not be formally organized nor need it memorialize its intentions in writing; all that is required is that its members combine in furtherance of a common objective. *International Banknote Co. v. Muller*, 713

F. Supp. 612, 619 (S.D.N.Y. 1989). A group may be found when there is an agreement to act in concert with respect to purchasing, voting, disposing, or holding of shares. *Torchmark Corp. v. Bixby*, 708 F. Supp. 1070, 1083 (W.D. Mo. 1988) Here, the majority's conclusion that the investors did not act as a group overlooks the specific terms of the voting trust agreement and the negotiated stock purchase agreement. The voting trust agreement gave the two trustees the power to vote 61 percent of TBC shares. The negotiated stock purchase agreement gave the two trustees and two investor members the authority to sit on the TBC Board. Together, these powers gave the investors control of TBC.

The word "acquisition" is not ambiguous. The plain, ordinary, and popular meaning of "acquisition" when applied to the facts of this case demonstrates that the investors acquired TBC. Endorsement 12 excludes insurance coverage for any claim arising from an acquisition. This is a claim arising from an acquisition and the policy does not provide coverage. I would reverse the Court of Appeals and grant summary judgment for National Union.

ANDERSEN, C.J., and DURHAM and MADSEN, JJ., concur with GUY, J.