[No. 49198-9-I. Division One. February 24, 2003.]

JERROLD I. KAPLAN, *Appellant*, v. NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, *Respondent*.

792

*Michael T. Schein* (of *Reed, Longyear, Malnati & Ahrens, P.S.*), for appellant.

*James R. Hermsen* (of *Dorsey & Whitney, L.L.P.*), for respondent.

KENNEDY, J. — Jerrold I. Kaplan and his disability insurance carrier, Northwestern Mutual Life Insurance Company, dispute whether Kaplan is entitled to disability benefits from a date approximately five years earlier than the date Northwestern Mutual established for onset of disability.[1] The case was tried to a jury, which returned a verdict adverse to Kaplan. Kaplan argues in this appeal that the verdict was the product of two prejudicial legal errors requiring reversal. First, Kaplan contends that the trial court erred in denying his motion for summary judgment on the question of whether the "under the care of a licensed physician" clauses in his disability policies are ambiguous, and therefore must be construed in Kaplan's favor as a matter of law (instead, the trial court sent the issue of whether Kaplan complied with the clauses to the jury for determination). Second, Kaplan contends that the trial court failed to properly instruct the jury that Northwestern Mutual had the burden of proving actual prejudice from any failure on Kaplan's part to fulfill one or more of the conditions precedent to coverage for purposes of the disputed five-year period. Northwestern Mutual Life Insurance Company contends, inter alia, that neither of the claimed errors was preserved for review. We conclude that the first claim of error was preserved for review, although the second was not.[2] Because the "under the care of a

---

[1] In a previous appeal in this same lawsuit, this court reversed the trial court's grant of summary judgment in favor of Northwestern Mutual and remanded for a trial, in that genuine issues of material fact prevented judgment in favor of the insurer as a matter of law regarding whether Kaplan gave notice of his claim of disability as soon as reasonably possible. *See Kaplan v. N.W. Mut. Life Ins. Co.*, 100 Wn. App. 571, 990 P.2d 991 (2000) (*Kaplan I*).

[2] Our discussion of this second issue lacks precedential value, and will be treated in the unpublished portion of this opinion.

licensed physician" clauses contained in the policies here at issue are subject to at least two reasonable interpretations, so that their actual meaning is unclear, they are ambiguous as a matter of law, and must be construed in Kaplan's favor. Accordingly, the trial court erred in failing to grant Kaplan's motion for summary judgment on that issue, and in submitting the issue of Kaplan's fulfillment of that condition to the jury. We reverse and remand for a new trial on that basis.

## FACTS

During the 1970s and 1980s, Jerrold Kaplan purchased six disability insurance policies from Northwestern Mutual Life Insurance Company: three series "KK" policies, issued on December 21, 1978, December 21, 1979, and February 25, 1981, respectively; two series "LL" policies, issued on February 15, 1982, and December 9, 1982, respectively; and one series "MM" policy, issued on July 30, 1985. It is undisputed that Kaplan suffers from severe, unrelenting, and treatment-resistant obsessive-compulsive disorder, a chronic psychiatric disorder characterized by repetitive behaviors and intrusive, anxiety-producing thoughts, and that he has been disabled by this condition since at least March 9, 1994, when the condition was first diagnosed. It is also undisputed that Kaplan paid all premiums due under all six of the policies until Northwestern Mutual found him to be disabled, and waived further premiums. It is also undisputed that Kaplan has suffered from obsessive-compulsive disorder for many years, although Northwestern Mutual claims that it cannot determine the degree of Kaplan's disability, if any, during the disputed five-year period because he was not being treated for obsessive-compulsive disorder by a licensed physician during that time. Kaplan was fired from his last steady job as a computer programmer on June 29, 1989, for "unsatisfactory performance." Except for a very short and unsuccessful stint as a telemarketer, Kaplan has been unemployed since that date.

In 1992, after doing some reading on the subject of obsessive-compulsive disorder and suspecting that he might have the disorder, Kaplan applied to participate in an obsessive-compulsive disorder research study being conducted by Dr. Dane Wingerson of Harborview Medical Center. Dr. Wingerson interviewed Kaplan, but rejected him from the study, telling him that he did not have obsessive-compulsive disorder. In 1994, Kaplan responded to another advertisement for an obsessive-compulsive disorder study being conducted by Dr. Peter Londborg of the University of Washington. Dr. Londborg diagnosed Kaplan with obsessive-compulsive disorder on March 9, 1994, and accepted him into the study, which was for the purpose of testing a new drug developed by Pfizer. When it became apparent that the drug being tested was not helping Kaplan, Dr. Londborg removed him from the study for his own good, prescribed a different medication for him, and referred him to a different psychiatrist for ongoing treatment. Dr. Londborg believes that the disorder has been the major factor in Kaplan's inability to work since 1989. Kaplan has testified that it was only after his final interview with Dr. Londborg, in July 1994, during which Dr. Londborg expressed his opinion of the seriousness of Kaplan's illness, that Kaplan understood and accepted that he was disabled by obsessive-compulsive disorder.

Kaplan submitted notice of his claim of disability to Northwestern Mutual Life Insurance Company on August 6, 1994. He defined the onset date of his disability as June 29, 1989, the last day of his job as a computer programmer. However, Northwestern Mutual defined the onset date of disability as March 9, 1994, the date that Dr. Londborg diagnosed Kaplan as having obsessive-compulsive disorder, and denied Kaplan's request to push back the onset date of disability to June 29, 1989, pointing to the notice and proof of claim sections of the policies. Northwestern Mutual also informed Kaplan that it would not pay benefits for any period before March 1994 because Kaplan had not been under the care of a licensed physician for the disorder until that time.

Kaplan filed this lawsuit in March 1997, alleging, inter alia, that Northwestern Mutual had breached its insurance contracts by denying coverage for the disputed five-year period, and seeking to collect retroactive benefits from June 29, 1989, to March 9, 1994.[3] Kaplan averred that he had submitted notice and proof of claim as soon as reasonably possible, as required by his disability insurance policies. He also contended that Northwestern Mutual was required to demonstrate that it had been prejudiced by his failure to make his claim any sooner.

Northwestern Mutual moved for summary judgment on the timely notice and proof of claim issues, arguing that Kaplan had violated the policy provisions requiring timely notice and proof of disability for purposes of the disputed period, as a matter of law. The trial court granted summary judgment in favor of Northwestern Mutual, and Kaplan appealed. We reversed and remanded for trial, holding that Northwestern Mutual had the burden of proving that it was prejudiced by Kaplan's failure to sooner make and prove his claim, and that Kaplan had raised genuine issues of material fact regarding both prejudice and when a reasonable person suffering from obsessive-compulsive disorder—who was told by a physician that he did not have that disorder—would realize that he did have the disorder, and was disabled by it, so as to make a claim to his disability insurer. *See Kaplan v. N.W. Mut. Life Ins. Co.*, 100 Wn. App. 571, 575-76, 579-80, 990 P.2d 991 (2000) (*Kaplan* I).

Following our remand, and after additional pretrial discovery, Kaplan moved for summary judgment on each of his substantive claims, reserving only the question of damages. Insofar as here relevant, Kaplan argued that the "under the care of a licensed physician" clauses contained in the insurance policies are subject to two conflicting reasonable meanings, so that the clauses are ambiguous as a matter of law, and must be strictly construed in favor of Kaplan. The trial court denied the motion, finding "the existence of a

---

[3] Kaplan also brought claims for bad faith, violation of the Consumer Protection Act, prejudgment interest, and attorney fees.

genuine issue of material fact as to each of the bases for the motion . . . ." Clerk's Papers at 670. Accordingly, the case proceeded to trial on Kaplan's breach of contract, bad faith, and Consumer Protection Act claims.

After the close of evidence, Northwestern Mutual moved under CR 50 to dismiss all causes of action as a matter of law. Insofar as here relevant, Northwestern Mutual argued that the breach of contract claim should fail as a matter of law because the policies required that Kaplan be "under the care of a licensed physician" during the entire period of his disability, and he clearly was not under the care of a licensed physician for obsessive-compulsive disorder until he was diagnosed by Dr. Londborg in March 1994. Northwestern Mutual also argued that it had proved prejudice as a matter of law because it is unclear what limitations Kaplan may have had in 1989, and whether earlier treatment would have helped to prevent his disability. Counsel for Kaplan argued in response (as he had argued during the earlier summary judgment proceedings) that the "under the care of a licensed physician" clauses are subject to a number of reasonable interpretations, and are, therefore, ambiguous as a matter of law, so that the clauses should not be construed adversely to Kaplan, and so that the question of his compliance with the "licensed physician" clauses should not even go to the jury. The trial court denied Northwestern Mutual's CR 50 motion, and sent all of Kaplan's claims to the jury.

With regard to the breach of contract claim, the jury was instructed that Kaplan had to prove (1) that Kaplan entered into each of the six contracts for disability insurance with Northwestern Mutual; (2) that for the period of claimed disability from June 29, 1989, to March 4, 1994, (a) Kaplan submitted a notice of claim of his disability as soon as reasonably possible, as required by all six of his disability insurance policies, (b) Kaplan submitted proof of disability as soon as reasonably possible, as required by three of the six disability insurance policies, and (c) Kaplan complied with the policy provision relating to being under the

care of a licensed physician, as required by all six of the disability insurance policies; (3) that Northwestern Mutual breached a term of a disability policy by refusing to pay Kaplan benefits for the disputed five-year period; and (4) that Kaplan sustained damages as a result of the breach.[4]

By special verdict, the jury answered "No" to the following question: "Do you find by a preponderance of the evidence that the defendant's denial of benefits for the time period at issue breached a term of an insurance contract between the parties?" Clerk's Papers at 666-67. Because the jury answered this question in the negative, it did not reach the remaining claims. The trial court entered judgment on the verdict in favor of Northwestern Mutual. Kaplan appeals.

## STANDARD OF REVIEW

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). An appellate court reviews a grant or denial of summary judgment de novo. *Green v. A.P.C.*, 136 Wn.2d 87, 94, 960 P.2d 912 (1998). On review of an order granting or denying summary judgment, the appellate court will consider only issues and evidence called to the attention of the trial court. RAP 9.12. "A summary judgment denial cannot be appealed following a trial if the denial was based upon a determination that material facts are disputed and must be resolved by the factfinder." *Brothers v. Pub. Sch. Employees of Wash.*, 88 Wn. App. 398, 409, 945 P.2d 208 (1997); *Johnson v. Rothstein*, 52 Wn. App. 303, 304, 759 P.2d 471 (1988). However, such an order is subject to review "if the parties dispute no issues of fact and the decision on summary judgment turned solely on a substantive issue of law." *Univ.*

---

[4] The jury was also instructed that to find that Northwestern Mutual had breached a term of a policy, at least 10 jurors must agree on which term of which policy was breached.

*Vill. Ltd. Partners v. King County*, 106 Wn. App. 321, 324, 23 P.3d 1090, *review denied*, 145 Wn.2d 1002 (2001). Issues of law are reviewed de novo. *Clayton v. Grange Ins. Ass'n*, 74 Wn. App. 875, 877, 875 P.2d 1246 (1994).

## DISCUSSION

 Kaplan argues that the trial court erred in denying his pretrial motion for summary judgment that the "under the care of a licensed physician" clause in each of his disability insurance policies is ambiguous as a matter of law because it is susceptible to at least two reasonable interpretations, and must, therefore, be construed in his favor to mean that he needed to be under the care of a physician at the time he made a claim for benefits, and not during the preceding five years for which he seeks disability benefits. The interpretation of an insurance policy is a question of law. *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wn.2d 789, 797, 881 P.2d 1020 (1994). " 'An insurance policy provision is ambiguous when it is fairly susceptible to two different interpretations, both of which are reasonable.' " *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wn.2d 678, 690, 871 P.2d 146 (1994) (quoting *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992)). "Whether an insurance policy contains an ambiguity is properly a question of law to be resolved by the court." *Baehmer v. Viking Ins. Co. of Wis.*, 65 Wn. App. 301, 303-04, 827 P.2d 1113 (1992). If policy language is ambiguous, and no genuine issues of material fact are placed in dispute, summary judgment should be entered in favor of the insured. *State Farm Mut. Auto. Ins. Co. v. Johnson*, 72 Wn. App. 580, 584-87, 871 P.2d 1066 (1994).

Northwestern Mutual does not dispute these governing principles of insurance law. Nor does it *seriously*[5] argue on appeal that the "under the care of a licensed physician"

---

[5] Northwestern Mutual devotes only one paragraph in its brief for this appeal to the proposition that the "licensed physician" clauses are not ambiguous. Northwestern Mutual writes:

What this appeal presents is an effort by Kaplan's new appellate counsel to circumvent the trial record and create an argument never discretely framed for

clause contained in each of its policies is *not* ambiguous. Instead, it argues that Kaplan failed to preserve this issue for review, in that he raises this *precise* issue for the first time on appeal.

■ As Northwestern Mutual characterizes the summary judgment proceeding below, Kaplan never asked the court to rule that the licensed physician clauses were ambiguous on their faces; rather, he argued that they were ambiguous based only on extrinsic evidence in the form of an alleged admission against interest by a Northwestern Mutual officer that the clauses were reasonably susceptible to two different meanings—when the evidence with respect to the alleged admission was disputed. We dispose of Northwestern Mutual's contention by reviewing the motion for summary judgment itself.

In the "Statement of Issues" section of his motion for summary judgment filed on June 6, 2001, Kaplan identified the issues with respect to the "under the care of a licensed physician" clauses to be as follows:

> 1. Whether the "licensed physician" clause contained in the six insurance policies at issue is ambiguous and subject to more than one reasonable interpretation.
>
> 2. Whether an ambiguous . . . clause must be strictly construed against the insurer . . . .

Clerk's Papers at 257.

---

the trial court. In essence, appellant's counsel is asking this court to rule on a "motion" never made in the trial court. Had the argument been made at the trial court level, it would have neither been successful nor determinative of the outcome. For example, in *Stinnett v. Northwestern Mutual Life Insurance Co.*, 101 F. Supp. 2d 720 (S.D. Ind. 2000), the Court held that the provision in Northwestern's policies requiring that the insured be under the care of a licensed physician during the period of disability was unambiguous and enforceable and operated to bar benefits prior to the time that the insured first saw a physician for his claimed disability. See also, *Music v. United Ins. Co. of America*, 59 Wn.2d 765, 370 P.2d 603 (1962). However, as the argument/motion was never presented to the trial court, nothing more need be said.

Resp'ts' Br. At 22. Although Northwestern Mutual vigorously argued the ambiguity issue below, it cannot rely on its briefing to the trial court for purposes of appeal. *See Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration [on appeal;] . . . trial court briefs cannot be incorporated into appellate briefs by reference").

In the "Authority and Argument" portion of the motion, Kaplan stated the following:

> Insurance policies are subject to very specific rules of construction not applicable to other contracts generally. *Lynott v. National Union Fire Ins. Co.*, 123 Wn.2d 678, 690-91, 871 P.2d 146 (1994). Where an ambiguity is alleged to exist in an insurance contract, courts follow the analysis set forth in *Lynott*:
>
>> An insurance policy provision is ambiguous when it is fairly susceptible to two different interpretations, both of which are reasonable. *Stanley v. Safeco Ins. Co. of Am.*, 109 Wn.2d 738, 741, 747 P.2d 1091 (1988). If exclusionary language is ambiguous, it is proper to construe the effect of such language against the drafter. *National Union Fire Ins. Co.*, at 210 . . . . Thus, if an insurance policy's exclusionary language is ambiguous, the legal effect of such ambiguity is to find the exclusionary language ineffective.
>
> [C]iting *McDonald v. State Farm Fire & Casualty Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992) (citation omitted). "Ambiguous clauses must be construed in favor of the insured, even though the insurer may have intended another meaning." *State Farm*, 72 Wn. App. at 589, citing *Vadheim v. Continental Ins. Co.*, 107 Wn.2d 836, 840-41, 734 P.2d 17 (1987).
>
> In addition to the "two different interpretations" rule for determining the existence of an ambiguity, language in an insurance policy is also held to be ambiguous if it is "uncertain" in meaning. *See Mayer v. Pierce County Medical Bureau*, 80 Wn. App. 416, 909 P.2d 1323 (1995). *See generally Phil Schroeder, Inc. v. Royal Globe Ins.*, 99 Wn.2d 65, 69, 659 P.2d 509 (1983), *modified, corrected, on other grounds*, 101 Wn.2d 830, 683 P.2d 186 (1984) (language of "uncertain import").

Clerk's Papers at 258-59. A fair reading of these excerpts from the motion can lead only to the conclusion that Kaplan adequately informed the trial court that he was asking it to rule as a matter of law that the "licensed physician" clauses contained in the six policies are ambiguous, in that they are subject to two reasonable meanings, and accordingly to rule as a matter of law that the clauses are required to be

construed in favor of the insured. We reject Northwestern Mutual's contention that the precise issue raised on appeal was not raised before the trial court.

■ It is true that Kaplan went on to argue that Barbara Schwigel, a senior consultant in Northwestern Mutual's disability benefits department, admitted at her deposition that there are two reasonable interpretations of the licensed physician clauses. No doubt pleased that he had wrung what he viewed as an admission out of Ms. Schwigel, Kaplan specifically argued that "[u]nder these admissions by [Northwestern Mutual]," the licensed physician clauses must be construed against Northwestern. Clerk's Papers at 261. Northwestern Mutual disputed that Ms. Schwigel's deposition testimony could properly be construed as an admission against interest. Presumably, this was the basis for the trial court's ruling that genuine issues of material fact precluded summary judgment in Kaplan's favor. But the disputed issue of fact as to whether Ms. Schwigel did or did not make an admission against the interest of Northwestern Mutual is not a *material* issue of fact upon which the ultimate legal question of whether the clauses are ambiguous depends. This should have been clear to the trial court, in that Northwestern Mutual itself correctly pointed out in its memorandum of authorities in opposition to the motion for summary judgment that the question of whether policy language is ambiguous is a legal question, not a factual one. Northwestern Mutual wrote: "Moreover, only the Court can determine the **legal** issue of whether there is more than one 'reasonable' interpretation of a policy provision. *See PUD No. 1 of Klickitat County v. International Ins. Co.*, 124 Wn.2d at 797 ('The interpretation of insurance policies is a question of law[.]') (Citations omitted)."

In sum, the precise legal issue presented by this appeal was presented to the trial court at the summary judgment stage. We are not precluded from review by the fact that the trial court sent the issue of Kaplan's compliance with the "licensed physician" clauses to the jury in the erroneous belief that there was a material factual issue for the jury to

decide. Although it is generally true that a denial of summary judgment based on a determination that material facts are in dispute cannot be appealed following a trial on the merits, this is not the case where the disputed issues of fact were not material—that is, where the decision on summary judgment turned solely on a substantive issue of law. *See Univ. Vill. Ltd. Partners*, 106 Wn. App. at 324-25; *Clayton*, 74 Wn. App. at 877. Accordingly, we will proceed with our de novo review.[6]

The clauses at issue are virtually identical in the KK and LL policies. They provide that the insurer will pay disability benefits if the insured "is under the care of a licensed physician other than himself . . . ." *See, e.g.*, Clerk's Papers at 220. The MM policy provides that the insurer will pay disability benefits if the insured "is under the care of a licensed physician other than himself during the time he is disabled . . . ." Clerk's Papers at 243.

" 'A clause in a policy is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.' " *Greer v. N.W. Nat'l Ins. Co.*, 109 Wn.2d 191, 198, 743 P.2d 1244 (1987) (quoting *Vadheim v. Cont'l Ins. Co.*, 107 Wn.2d 836, 841, 734 P.2d 17 (1987)). "In construing the language of an insurance contract, the contract as a whole is examined, and if, on the face of the contract, two reasonable and fair interpretations are possible, an ambiguity exists." *Nichols v. CNA Ins. Cos.*, 57 Wn. App. 397, 400, 788 P.2d 594 (1990). "When an ambiguity in the policy exists, a meaning and construction most favorable to the insured must be applied, even though the insurer may have intended another meaning." *Id.* (citing

---

[6] We summarily reject Northwestern Mutual's contention that Kaplan waived the ambiguity issue by submitting instructions, which the trial court gave to the jury, regarding interpretation of ambiguous contract language. At that stage of the proceedings, having lost the summary judgment motion, Kaplan was entitled to request the most favorable instructions available to him based on the trial court's view of the applicable law. Neither was Kaplan required to bring a futile CR 50 motion at the close of the evidence, asking the court to reverse its previous summary judgment ruling, in order to preserve the issue for appeal. In any event, the record shows that Kaplan again reminded the trial court of the applicable law regarding ambiguous insurance clauses, while arguing against Northwestern Mutual's CR 50 motion.

*Riley v. Viking Ins. Co.*, 46 Wn. App. 828, 830, 733 P.2d 556 (1987)).

In construing an insurance policy, the court gives the policy language the same " 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' " *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994) (quoting *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 95, 776 P.2d 123 (1989)). "[T]he entire contract must be construed together so as to give force and effect to each clause." *Transcon. Ins. Co. v. Wash. Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d 452, 456, 760 P.2d 337 (1988). "Undefined words and terms used in an insurance policy should be understood in their ordinary, plain, and popular sense." *Heringlake v. State Farm Fire & Cas. Co.*, 74 Wn. App. 179, 185, 872 P.2d 539 (1994).

Kaplan argues that, on their faces, these "under the care of a licensed physician" clauses are subject to several reasonable interpretations: First, they could mean that the insured must be under the care of a licensed physician at the time he submits the claim for benefits. This was the interpretation suggested by Kaplan below, and the primary interpretation that he espouses on appeal. Second, the clauses could mean that the insured must have been under the care of a licensed physician for the entire period for which benefits are sought. This is the interpretation suggested by Northwestern Mutual below, and although Northwestern Mutual has all but abandoned the argument for failure to adequately brief it for this appeal, Kaplan admits in his opening brief for this appeal that this would be an equally reasonable interpretation of the clause. Third, Kaplan contends that "licensed physician" could mean a specialist who is treating the specific condition that gave rise to the insured's disability, or it could mean any licensed physician who is treating the insured for any purpose. Fourth, Kaplan argues that the phrase "under the care of" could mean seeing a licensed physician solely for individual treatment, or it could mean participating in a study after

diagnosis by the licensed physician conducting the study.[7] Kaplan also notes that the clause does not specify how often the licensed physician must be seen in order to meet the standard of being "under the care of" a licensed physician. Finally, Kaplan questions whether the clause should apply to Kaplan at all, given that Dr. Wingerson erroneously told Kaplan in 1992 that he did not have obsessive-compulsive disorder, and given that there is no question whatsoever that Kaplan has had the disorder for many years, and that his disability, at least from the time of Dr. Londborg's diagnosis, undisputedly is real, serious, and permanent. *See Music v. United Ins. Co. of Am.*, 59 Wn.2d 765, 768-69, 370 P.2d 603 (1962) (licensed physician clause does not apply in cases of permanent disability, because the law does not require performance of futile acts, and because primary purpose of such a provision is to establish good faith of insured's claim to guard against fraud).

Kaplan's MM policy provides that benefits will be paid only if the Insured "is under the care of a licensed physician other than himself during the time he is disabled . . . ." Kaplan notes that Northwestern Mutual apparently added the latter six words to clarify the ambiguity inherent in the KK and LL policies, but maintains that the language remains ambiguous because a reasonable purchaser of insurance could reasonably interpret the "during the time he is disabled" language to mean either during the entire period of disability, or at some point "during" the time of the disability. Furthermore, according to Kaplan, the clause in the MM policy remains ambiguous because (1) it does not specify how often a licensed physician must be seen in order for the insured to be "under the care" of that physician, (2) use of the word "is" indicates a present tense requirement, rather than implying past medical care, (3) the meaning of "licensed physician" is still not clear—it could mean a

---

[7] We observe that Northwestern Mutual accepted Dr. Londborg's diagnosis, even though it was made for purposes of Kaplan's participation in the study, not for purposes of individual treatment. Thus, Kaplan's fourth suggested meaning would appear to be reasonable, in that Northwestern Mutual treated it as reasonable. Northwestern Mutual does not claim otherwise in this appeal.

specialist for the specific condition or any licensed physician for any purpose, (4) it is still not clear whether "under the care of" could mean participating in a study conducted by a licensed physician who is testing various treatments, and (5) the clause fails to resolve the ambiguity inherent where seeking treatment would be a futile act, either because the condition has been initially misdiagnosed by a licensed physician, or because the disability is permanent and treatment-resistant in any event.

Northwestern Mutual does not respond to these contentions on appeal. Below, Northwestern Mutual took the position that regardless of the change of wording in the MM policy, all of the policies mean the same thing—that Kaplan must have been under the care of a licensed physician who was treating him for the condition that gave rise to the disability, for the entire period of time for which benefits are sought.

Kaplan further contends that the licensed physician clauses are ambiguous when the policies are viewed as a whole. First, each policy requires that "notice of claim" or "proof of disability" be given, which would most reasonably be interpreted to mean supplying medical confirmation of the disabling condition; yet, as pointed out by this court in the first appeal, the period in which notice must be given has not begun to run for the KK policies, and it is to be given as soon as reasonably possible for the LL and MM policies. *See Kaplan* I, 100 Wn. App. at 581-83. According to Kaplan, this contradicts Northwestern Mutual's position that the requirement is that the insured must be under the care of a licensed physician at all times during the period for which benefits are claimed. Moreover, "Beginning Date" for the payment of benefits is defined as "the date on which benefits begin to accrue after the Insured becomes disabled . . . ." which is keyed to the onset of disability, not to the date the insured submits himself to the care of a licensed physician.[8] Clerk's Papers at 220.

---

[8] Kaplan also argues that although these clauses are found in the benefits section of the policies, they operate as exclusions. Where an exclusion is not placed

Kaplan does not need to show that his list of possible interpretations, or any one of them, is more reasonable than that espoused by Northwestern Mutual, but only that there is more than one reasonable interpretation. Although we do not find all of Kaplan's proposed interpretations equally persuasive, we are persuaded that Kaplan's primary proposed interpretation is at least as reasonable as that espoused by Northwestern Mutual below. Although Northwestern Mutual has not persuasively briefed its own proposed interpretation for this appeal, Kaplan admits that its interpretation is reasonable, and we will treat it as such, for purposes of this appeal.[9] As to the MM policy, at least, the policy language could reasonably lend itself to that interpretation.

But in the final analysis, we agree with Kaplan that an ordinary person who is considering purchasing a disability insurance policy, such as the KK and LL policies that are before us in this appeal, could reasonably believe that the clauses mean that he or she must be under the care of a licensed physician at the time the claim of disability is made. This is because the clauses are stated in the present tense, and also because the policies all require that the insured provide notice of the claim of disability, or proof of disability, which implies that medical confirmation of the disability will be necessary. Such medical confirmation is likely to be available only from a physician who is treating

where it would reasonably be expected by the reader, in the exclusions section of the policy, such placement alone may create an ambiguity. 2 ERIC H. HOLMES, HOLMES' APPLEMAN ON INSURANCE 2D § 6.1 at 171-73 (1996). We summarily reject this argument. The clauses do not operate as exclusions from coverage. They operate as conditions precedent to the payment of benefits.

[9] Even so, we see little merit in Northwestern Mutual's position, particularly with respect to mental illnesses like obsessive-compulsive disorder. Medical literature contained in the record indicates that persons suffering from obsessive-compulsive disorder realize that their obsessions and compulsions are odd, and try to hide them. They also tend to think that they can simply "pull themselves together." They are often unaware that their symptoms are treatable, and when they finally do seek treatment, they are frequently misdiagnosed. Thus, one study found a 17-year gap between the onset of symptoms and proper diagnosis and appropriate treatment. *See* Eric Hollander, et al., *Obsessive-Compulsive Disorder and Spectrum Disorders: Overview and Quality of Life Issues*, 57 J. CLINICAL PSYCHIATRY 3-6 (Supp. 8 1996); Clerk's Papers at 345, 347.

the insured for the condition giving rise to the disability at the time he or she makes the disability claim—indeed, if that physician does not believe the insured person to be disabled by reason of the condition, the insured person is unlikely to make the claim at all. With respect to the MM policy, we also think that the ordinary person purchasing that policy could reasonably think that if he is under the care of a licensed physician at the time he makes his claim for benefits, he is, in fact, under the care of a licensed physician other than himself "during" the time he is disabled. Again, the clause is written in the present tense; it does not say that the insured *must have been* under the care of a licensed physician *at all times* or *during the entire time* that he *has been* disabled. Moreover, although the preposition "during" can mean throughout the duration of, it can also mean at some point in the course of. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 703 (1969) (defining "during" to mean "1: throughout the continuance or course of (no attainder of treason shall work corruption of blood or forfeiture except [during] the life of the person attainted— *U.S. Constitution*); 2: at some point in the course of (been away for a couple of weeks [during] the summer—J.M. Barzun)." Thus, an ordinary person shopping for disability insurance and reading the licensed physician clauses contained in each of the policies here at issue reasonably could believe that by being under the care of a licensed physician for the disabling condition "at some point in the course of" the disabling condition, he or she would meet the condition of coverage for the condition.

Because it is clear under the terms of all of the policies that the insured person must provide medical proof that he or she is disabled, the ordinary purchaser of such insurance is likely to believe that it is the ability to provide proof of the disability that is important, not the length of time that person has been under the care of a licensed physician before making the claim. Nothing in the policies, read as a whole, contradicts such an interpretation. In the LL policies, for example, "Beginning Date" is defined as "the date

on which benefits begin to accrue after the Insured becomes disabled." Clerk's Papers at 220. But the "Beginning Date" clause also states: "Benefits are not payable for the time the Insured is disabled before the Beginning Date." *Id.* Thus, the prospective purchaser of the policy would be alerted to the fact that "Beginning Date" may mean something different from the date of actual onset of the disability, and that the prospective purchaser must pay attention each time that the term "Beginning Date" is used in the policy. The term "Beginning Date" is not found in the paragraph containing the licensed physician clause, however. Thus, the prospective purchaser is not alerted to any requirement that the date on which benefits begin to accrue might have something to do with the "under the care of a licensed physician" requirement. Instead, such a prospective purchaser would learn, upon reading further, that "Beginning Date" in the KK policies means the 31st day of total or partial disability; in the LL policies it means the 181st day of disability in the first 360 days after the start of disability; and in the MM policy it means the 91st day of disability in the first 189 days after the start of disability.

The terms "disability" and "start of disability" are not defined in the policies. Instead, the policies focus upon "total" and "partial" disability, which are tied to inability to perform the principal duties of the insured person's occupation, not to the insured person being under the care of a licensed physician. Thus, the ordinary person shopping for disability insurance policies like those here at issue would likely conclude that he or she must be under the care of a licensed physician long enough before making a claim under any of the six policies for the physician to be able to state with reasonable medical certainty that the insured person was unable, by reason of his or her diagnosed condition, to perform the principal duties of his or her occupation from and after a given date, and remains so at the time the claim is made.

The necessary time for this to occur may vary with the nature of the condition, but we note from the record in this

case that both Dr. Londborg, who diagnosed and treated Kaplan before the claim was filed, and Dr. Stephen Dager, who began treating Kaplan after the date that Northwestern Mutual found Kaplan to be disabled and entitled to benefits, were both able to testify with reasonable medical certainty that Kaplan has been disabled by his condition ever since he was fired from his last steady employment in June 1989.

Northwestern Mutual is not bound by those medical opinions, of course, and is entitled under the terms of the policies to require that Kaplan be examined by a physician of its choosing. Northwestern Mutual did require such an examination, for purposes of this litigation. We observe that such an examination perforce will not take place before the insured person files a claim. A physician hired by Northwestern Mutual to examine an insured after the fact of the claim of disability should be no less capable of reaching an opinion with reasonable medical certainty regarding the onset date of a particular disability than is the insured's own physician—neither of whom may have been treating the insured at the onset of the disabling condition, particularly in the case of mental illness. The medical literature contained in the record reflects that in the case of obsessive-compulsive disorder, the insured's own physician may have diagnosed and begun treating the insured for that condition long after onset of the disability. *See, supra,* n.9.

Construing these licensed physician clauses in Kaplan's favor does not defeat the primary purpose of such clauses, in that a disability insurer is adequately protected from the possibility of fraud by its ability to challenge the medical opinion of the insured's own physician by the use of its own medical expert. Although there is no allegation of fraud in this case, our Supreme Court has held that the primary purpose of licensed physician clauses in disability insurance policies is the prevention of fraud. *See Music v. United Ins. Co. of Am.*, 59 Wn.2d 765, 769, 370 P.2d 603 (1962) (quoting *Mass. Bonding & Ins. Co. v. Springston*, 1955 OK 142, 283 P.2d 819, 823).

In sum, we conclude as a matter of law that the "under the care of a licensed physician" clauses in all six of the disability insurance policies here at issue are ambiguous. Because they are subject to at least two reasonable interpretations, their meaning is perforce uncertain. Kaplan is entitled as a matter of law to have these clauses interpreted in his favor. Thus, the trial court erred by submitting the question of whether Kaplan complied with these clauses to the jury. To the extent that the jury needed to be told about the clauses at all, the jury should have been instructed that Kaplan complied with the requirements of the clauses as a matter of law.

We are not persuaded otherwise by the scant authority cited by Northwestern Mutual in its one-paragraph treatment of the merits of the issue, in its brief for this appeal. Northwestern first cites *Stinnett v. Northwestern Mutual Life Insurance Co.*, 101 F. Supp. 2d 720 (S.D. Ind. 2000). The *Stinnett* court held that the licensed physician clauses in the disability insurance contracts there at issue were enforceable against an insured who claimed to have become disabled by reason of depression some 20 months before he sought treatment for the condition. It is unclear from the opinion which of Northwestern Mutual's standard-form policies were at issue in *Stinnett*. By implication, the policies may have contained language similar to, though seemingly not identical with the language contained in Kaplan's MM policy. Without purporting to quote the policy language itself, the court stated that the clauses there at issue contained "express provisions conditioning the recovery of benefits on the insured's being under the care of a licensed physician during the period of disability." *Id.* at 726. Kaplan's MM policy conditions the recovery of benefits on the insured being under the care of a licensed physician "during the time he is disabled . . . ."

The issue in *Stinnett* was *not* whether the policy language was ambiguous and ought to be interpreted in the light most favorable to the insured, as a matter of law. Instead, both sides in that case agreed that the clauses meant that

the insured was required to be under the care of a licensed physician for the entire period for which benefits were sought. The plaintiff argued that he nevertheless ought to be excused from the requirement because there was adequate proof of the onset date of his depression, other than medical proof, and because he had a reasonable excuse for having failed to seek earlier treatment. He argued that licensed physician clauses serve an evidentiary purpose, that is, to guard against fraudulent claims. And he argued that he ought to be excused from the requirement because he failed to recognize that his inability to work was because of depression. *Id.* at 723-24.

The *Stinnett* court explained that while licensed physician clauses do serve an evidentiary purpose, they also serve the additional purpose of minimizing the insurer's loss in cases where the insured could benefit from early medical intervention, either in terms of amelioration of the condition, or prevention of further deterioration. Mr. Stinnett provided no evidence that earlier treatment would not have ameliorated his condition. *Id.* at 725. The court also found Mr. Stinnett's excuse for not seeking treatment earlier was unlike those in cases cited by Mr. Stinnett in which courts had excused insureds from complying with licensed physician clauses, such as a case in which the insured sought treatment but discontinued it because the treatment was ineffective, a case in which the insured could not afford the cost of medical care, and a case in which the attending physician testified that he could do nothing for the insured other than advise him to rest and refrain from working. *Id.* at 724. We observe in passing that there was no evidence before the *Stinnett* court that the insured in that case had sought treatment for depression, only to be told by a licensed physician that he was not in fact depressed. We have no particular quarrel with the *Stinnett* court's resolution of the issues in that case. But the case is unpersuasive in terms of authority for the discrete issue in this case.

Northwestern Mutual also cites, without argument, *Music v. United Insurance Co. of America*, 59 Wn.2d 765. In

*Music*, the Washington Supreme Court refused to enforce a licensed physician clause against a permanently disabled logger. *Music*, 59 Wn.2d at 768-69. Northwestern has not explained how *Music* supports its position that the clauses here at issue are not ambiguous, and we find no support for that proposition on the pages of that opinion. In *Music*, the trial court granted the insurer's motion to remove the case from jury consideration on grounds of insufficiency of the plaintiff's evidence. One of the several bases upon which the insurer brought the motion was that the plaintiff insured had not been "under the regular and personal attendance of a licensed physician, surgeon, osteopath or chiropractor, other than the Insured" during the entire period of his claimed disability. *Id.* at 768. The Supreme Court reversed and remanded, noting that the plaintiff-insured had provided evidence that, after a period of continuous treatment, two physicians examined him and determined that he was totally disabled and that further treatment could not be expected to relieve him. *Id.* The court said: "The principle appears to be well settled that the above quoted provision of the policy does not apply in cases of permanent disability." *Id.* The *Music* court had no occasion to address the question of whether the policy language in that case was or was not ambiguous. Although *Music* is supportive of the reasoning of the *Stinnett* court regarding situations in which an insured might be excused from complying with a nonambiguous licensed physician clause (such as when compliance would be futile and is excused on that basis), *Music* is of no help to Northwestern Mutual here—where the issue is not whether the insured can be excused from compliance with an unambiguous clause, but rather whether an ambiguous clause must be interpreted in favor of the insured.

Reversed and remanded for a new trial.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports but will

be filed for public record in accord with RCW 2.06.040, it is so ordered.

Cox, A.C.J., and BAKER, J., concur.

Reconsideration denied November 17, 2003.