**TECK METALS, LTD., Plaintiff,**

v.

**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON and Certain London Market Insurance Companies, Defendants.**

No. CV–05–411–LRS.

United States District Court, E.D. Washington.

Aug. 10, 2010.

Order on Motion for Reconsideration and/or Clarification Oct. 22, 2010.

Alexander J. Lathrop, David F. Klein, Mark J. Plumer, Matthew G. Jeweler, Peri N. Mahaley, Orrick Herrington & Sutcliffe LLP, Washington, DC, Daniel J. Dunne, Jr., Orrick Herrington & Sutcliffe LLP, Seattle, WA, Jerry John Moberg, Jerry Moberg & Associates, Ephrata, WA, for Plaintiff.

Cathy Spicer, Gabriel T. Baker, Kathleen A. Nelson, Barry Neal Mesher, Lane Powell P.C., Stephen H. Goodman, Jr., Graham & Dunn P.C., Seattle, WA, for Defendants.

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT RE QUALIFIED POLLUTION EXCLUSION CLAUSE

LONNY R. SUKO, Chief Judge.

**BEFORE THE COURT** are Plaintiff's and Defendants' Cross–Motions For Summary Judgment Re The Qualified Pollution Exclusion Clause (Ct. Rec. 382 and 424). These motions were heard with oral argument on July 22. David F. Klein, Esq., argued for the Plaintiff. Gabriel Baker, Esq., argued for Defendants.

### I. BACKGROUND

This motion presents the same threshold issues which have been addressed in the court's "Order Re Motions For Summary Judgment Re Scope Of Coverage," namely: 1) is there an actual conflict between British Columbia law and Washington law?; and 2) if there is, does British Columbia or Washington have the "most significant relationship" to the coverage dispute so as to warrant application of its law?

The London Market Insurance policies contain an "Industries, Seepage, Pollution and Contamination Clause," aka "Qualified Pollution Exclusion Clause" which provides in relevant part:

This insurance does not cover any liability for:

(1) ... damage to or loss of use of property directly or indirectly caused by seepage, pollution or contamination, **provided always that this Paragraph (1) shall not apply ... where such seepage, pollution, or contamination is caused by a *sudden unintended and unexpected happening* during the period of this insurance.**

(2) The cost of removing, nullifying, or cleaning-up seeping, polluting or contaminating substances unless the seep-

age, pollution or contamination is caused by a *sudden, unintended and unexpected happening* during the period of this Insurance.

In *Queen City Farms, Inc. v. Central National Insurance Co. of Omaha,* 126 Wash.2d 50, 95, 882 P.2d 703 (1994), the Washington Supreme Court construed an identical clause and concluded that reading "sudden" to include a temporal limitation was problematic because it did "not make sense to speak of an abrupt, instantaneous seepage or leakage, nor of seepage or leakage occurring over a short period of time." The court found the language ambiguous, construed it against the insurer, refused to adopt any requirement of temporal suddenness and held coverage would be provided for any "unexpected and unintended" polluting event. *Id.*

## II. DISCUSSION

### A. Is there an actual conflict with B.C. law?

This court concludes there is not "sufficient proof to establish with reasonable certainty" that under principles of British Columbia law, British Columbia courts would necessarily reach a different conclusion than Washington courts regarding the specific language contained in the particular qualified pollution exclusion clause at issue.

Defendant's expert, Professor Brown, acknowledges that the British Columbia Supreme Court's decision in *Privest Properties Ltd. v. Foundation Co. of Canada,* 57 B.C.L.R. (2d) 88, 6 C.C.L.I. (2d) 23 (1991) at Paragraph 309, contains *obiter dicta* "to the effect that the terms 'sudden' and 'accidental' in a pollution exclusion clause refer to separate concepts." In *Privest,* the pollution exclusion clauses dictated exclusion unless the discharge, dispersal or release was not "sudden or accidental." The London Market Insurers (LMI) claim the court's framing of the question—"Was it continuous or was it sudden? Was it accidental"—shows the court considered the term "sudden" to contain a temporal element, but Professor Brown concedes that the court was not presented with, and did not rule upon, the specific question of whether "sudden" and "accidental" refer to separate concepts. Defendant's expert, Brenner, asserts the judge in *Privest* "**held** that sudden contains a temporal element," (emphasis added), but that is contrary to even Professor Brown's conclusion.

Professor Brown acknowledges the term "sudden" can be "used as a synonym for unintended or unexpected," but asserts the "ordinary meaning of the word 'sudden,' when viewed as something different from unintended or unexpected, incorporates a temporal element." Therein lies the problem and why the Washington Supreme Court found the term "sudden" to be ambiguous in the particular pollution exclusion clause at issue in the *Queen City Farms* case. Professor Brown acknowledges the term has the potential to be considered ambiguous, but his view is it is not ambiguous and furthermore, the "resolution of the ambiguity would … be constrained by the concept of reasonable expectations of the parties, including the insurer." Professor Brown says his conclusion is based on "binding principles of policy interpretation applied in Canada including British Columbia" and contends that "[i]f the exclusion was given the meaning advanced by [Teck], it is difficult to see in what circumstances it would apply." Actually, however, if the word "sudden" is not deemed to include a temporal element, the exclusion still applies if the damage was not "unexpected or unintended," as held by the Washington Supreme Court in *Queen City Farms.*

LMI also resort to reliance on trial court decisions from Ontario which, although perhaps persuasive to a B.C. court, are not binding on a B.C. court. The phrase at issue in those cases was "sudden and accidental" which was construed as having a temporal element. Arguably, the phrase "sudden **and** accidental" more likely suggests a distinction in those terms than "sudden **or** accidental." (Emphasis added). That said, the affidavit of Plaintiff's expert, Hilliker, addresses these Ontario decisions and explains that not only are they not binding in B.C., but he further asserts they are not consistent with each other and do not even settle the law in Ontario.

The competing affidavits of Hilliker and Brown reveal the law is not settled in B.C. regarding how a B.C. court would interpret the particular qualified pollution exclusion clause at issue here. It is not "reasonably certain" that a B.C. court would conclude that the term "sudden" in this particular clause contains a temporal element. As a matter of law, the court concludes there is no conflict and accordingly, per Washington law as set forth in the *Queen City Farms* decision, the term "sudden" in the qualified pollution exclusion clause at issue here does not contain a temporal element distinct from the terms "unexpected and unintended."

## B. If there is a conflict, should B.C. or Washington law apply?

For the reasons specified in its "Order Re Motions For Summary Judgment Re Scope Of Coverage," this court concludes Washington has the "most significant relationship" to the parties' coverage dispute and therefore, if there is a conflict, Washington law would apply.

## C. Extrinsic Evidence Re Term "Sudden"

■ LMI contend that even if Washington law applies, there is extrinsic evidence indicating Teck understood the term "sudden" to contain a temporal element. Accordingly, LMI contend the language in the clause is not ambiguous.

■ "Extrinsic evidence is admissible to assist the court in ascertaining the parties' intent and interpreting the contract," and only "[a]fter examining the available extrinsic evidence" may any remaining ambiguity be resolved against the insurer. *Moeller v. Farmers Insurance Co. of Washington,* 155 Wash.App. 133, 141, 229 P.3d 857 (2010). In *Queen City Farms,* the state supreme court observed that there was "no extrinsic evidence as to the parties' intent," but it also noted that "while evidence of the parties' mutual intent may be helpful in some contexts, we have recognized that sometimes language in standard policies does not involve mutual negotiations between the insurers and the insureds." 126 Wash.2d at 82, 882 P.2d 703. Thus, the court concluded it was "left with ambiguity in a nonnegotiated standard form insurance provision." *Id.* at 83, 882 P.2d 703. "Where there are actual negotiations, the context principle, as appropriately limited by its definition, permits admission, and examination of extrinsic evidence." *Lynott v. National Union Fire Ins. Co.,* 123 Wash.2d 678, 684, 871 P.2d 146 (1994).[1]

■ It is not apparent to this court from any of the extrinsic evidence cited by

---

1. The "context principle" or "context rule" is that ambiguity in the meaning of contract language need not exist before evidence surrounding the making of the contract is admissible. *Lynott,* 123 Wash.2d at 683, 871 P.2d 146, citing *Berg v. Hudesman,* 115 Wash.2d 657, 801 P.2d 222 (1990).

LMI in its June 23 reply brief (Ct. Rec. 455 at pp. 5–11) that there was actual negotiation between Teck **and LMI** regarding the qualified pollution exclusion clause contained in the policies. The evidence consists primarily of statements made by Teck officials to Teck's insurance broker, and statements by the broker to Teck officials. It is not apparent from the evidence that the broker actually negotiated with LMI regarding the clause. Thus, even if this evidence somehow shows that Teck unilaterally concluded that only temporally abrupt happenings were covered, that does not resolve the ambiguity of the term "sudden" contained in the qualified pollution exclusion clause. "Unilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the **parties'** intentions." *Lynott,* 123 Wash.2d at 684, 871 P.2d 146 (emphasis added). LMI asserts the *"Queen City Farms* court would have reached a different outcome if, as here, extrinsic evidence of the insured's interpretation of 'sudden' had eliminated potential ambiguity." (Ct. Rec. 455 at p. 10). Again, what is necessary is not extrinsic evidence of a party's unilateral interpretation or intent, but rather extrinsic evidence of the parties' mutual intent which, in the insurance context, arises from actual mutual negotiations that took place between them. The court has yet to be presented with extrinsic evidence of the latter.

The court recognizes discovery is ongoing and the fact discovery deadline is November 15, 2010. Accordingly, it is possible that extrinsic evidence may be discovered which is relevant to the parties' mutual intent and the existence of mutual negotiations between them regarding the qualified pollution exclusion clause. At this time, the court finds as a matter of law, based on the language of the clause and the applicable Washington law, that the term "sudden" does not contain a temporal element. The court will not, however, preclude Defendants from filing a motion at a later date based on newly discovered extrinsic evidence which Defendants contend establishes that the parties mutually understood, pursuant to actual mutual negotiations, that the term "sudden" has a temporal meaning.

**D. What Is The Relevant "Happening" Under Washington law?**

■ Teck asks the court to find as a matter of law that the relevant "happening" is the release of hazardous substances from the slag which occurred after the slag was carried across the border and settled in certain portions of the Upper Columbia River (UCR) site in the United States. LMI ask the court to find as a matter of law that the relevant "happening" is the initial discharge from the Trail, B.C. smelter, that this was not "unintended or unexpected," and therefore, that the pollution exclusion clause applies.

According to the LMI policies:

**The term "Occurrence" wherever used herein shall mean an accident or a *happening* or an event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury property damage, or advertising *liability* during the policy period.** All such exposure to substantially the same general conditions existing or emanating from one premises location shall be deemed *one occurrence.*

(Emphasis added).

The plain language of this clause indicates the relevant "happening" is one which gives rise to liability. This makes senses since, of course, the LMI policies are liability policies. At issue in the *Pakootas* case is Teck's potential liability un-

der CERCLA and it is this for which Teck seeks insurance coverage in the captioned matter. According to the Ninth Circuit Court of Appeals:

> [T]he operative event creating a liability under CERCLA is the release or threatened release of a hazardous substance. *See* [42 U.S.C.] § 9607(a)(4). **Arranging for disposal of such substances, in and of itself, does not trigger CERCLA liability,** *nor does actual disposal of hazardous substances.* A release must occur or be threatened before CERCLA is triggered. A party that "arranged for disposal" of a hazardous substance under § 9607(a)(3) does not become liable under CERCLA until there is an actual or threatened release of that substance in to the environment. Arranging for disposal of hazardous substances, in itself, is neither regulated nor prohibited under CERCLA. **Further, disposal activities that were legal when conducted can nevertheless give rise to liability under § 9607(a)(3) if there is an actual or threatened release of such hazardous substances into the environment.**
>
> The location where a party arranged for disposal or disposed of hazardous substances is not controlling for purposes of assessing whether CERCLA is being applied extraterritorially, because CERCLA imposes liability for releases or threatened releases of hazardous substances, and not merely for disposal or arranging for disposal of such substances. **Because the actual or threatened release of hazardous substances triggers CERCLA liability** *and because the actual or threatened release here the leaching of hazardous substances from slag that settled at the Site,* **look place in the United States, this case involves a domestic application of CERCLA.**

*Pakootas v. Teck Cominco Metals, Ltd.,* 452 F.3d 1066,1077–78 (9th Cir.2006).

Based on the foregoing, the court must conclude the relevant "happening" is the actual or threatened releases of hazardous substances from slag ("in both liquid and solid form" [2]) that settled in the UCR Site in the United States.[3] The relevant "happening" is actual or threatened releases that occurred in the United States because it is these releases which give rise to potential liability under CERCLA, not the disposal which occurred at the Trail smelter in Canada.[4] In order for Teck to avoid the exclusion in the qualified pollution exclusion clause, Teck will have to establish that these releases were "unintended and unexpected." That said, the court is not willing, at this time, to declare that Teck's "disposal" of slag into the river at its Canadian smelter is wholly irrelevant to the issue of whether Teck did not intend or expect "releases" of hazardous substances from the slag once it settled in the UCR site in the United States.[5] Obviously, if

---

2. *Pakootas,* 452 F.3d at 1069.

3. There is debate whether slag itself is a "hazardous substance." Assuming it is, CERCLA liability still hinges on whether a "release" occurred in the United States, not on the fact the slag was disposed of into the Columbia River at Trail, B.C. And in order to avoid the exclusion, Teck will have to establish that it did not expect or intend that the slag itself

would "contaminate" the UCR and give rise to potential liability under CERCLA.

4. "It is the Canadian equivalent of RCRA [Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6992k], not CERCLA, that regulates how Teck disposes of its waste within Canada." *Pakootas,* 452 F.3d at 1078.

5. Under CERCLA, "release" is defined as "any spilling, leaking, pumping, pouring, em-

the slag had not first been disposed of in the river at the Trail smelter, it would not have come to settle in the UCR site in the United States. Although the initial disposal of the slag is not the liability-creating event ("the happening"), it may have potential relevance to the liability-creating event which is the subsequent leaching of hazardous substances from the slag after it arrived at the UCR site in the United States. The parties should keep this in mind as discovery proceeds in this matter.

## III. CONCLUSION

The court finds as a matter of law that there is no actual conflict of law between B.C. and Washington regarding interpretation of the term "sudden" in the particular qualified pollution exclusion clause at issue in the LMI policies and therefore, that Washington law applies. Under Washington law, the term "sudden" is considered ambiguous and therefore, does not necessarily include a temporal element. LMI is not, however, precluded from subsequently presenting this court with newly discovered relevant extrinsic evidence which they contend shows the parties mutually understood, pursuant to actual mutual negotiations, that the term "sudden" has a temporal meaning.

The court finds as a matter of law that the relevant "happening" for the purpose of determining whether or not the exclusion applies is the release of contaminants from slag coming to rest in the UCR Site in the United States. This is the liability-creating event under CERCLA for which

Teck seeks coverage under the policies. Assuming the term "sudden" does not include a temporal element, what remains to be determined is if Teck intended or expected that said contaminants would be released from the slag once it came to rest in the United States.

Plaintiff's Motion For Summary Judgment On The Qualified Pollution Exclusion (Ct. Rec. 382) is **GRANTED** to the extent set forth above. Defendants' Cross–Motion For Summary Judgment On The Qualified Pollution Exclusion (Ct. Rec. 424) is **DENIED**. Plaintiff's Motion To Strike London Insurers' Reply On The Qualified Pollution Exclusion (Ct. Rec. 465) is **DENIED** as moot.[6]

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to counsel of record.

### ORDER RE MOTION FOR RECONSIDERATION AND/OR CLARIFICATION

**BEFORE THE COURT** is the Defendants' Motion For Reconsideration And/Or Clarification (Ct.Rec.536). At its discretion, the court has decided this motion without oral argument. LR 7.1(h)(3)b.v.

## I. RECONSIDERATION

A Fed.R.Civ.P. 59(e) motion for reconsideration can only be granted when a district court: (1) is presented with newly discovered evidence; or (2) committed clear error or the initial decision was mani-

---

itting, emptying, discharging, injecting, escaping, leaching, dumping, or **disposing** into the environment...." 42 U.S.C. Section 9601(22). (Emphasis added). The definition of release includes "disposing." CERCLA defines disposal by reference to RCRA's definition of "disposal" at 42 U.S.C. Section 6903(3). See *Pakootas*, 452 F.3d at 1078, n. 17. There may be circumstances in which a

"release" is indistinguishable from a "disposal."

6. Defendants' request for a Fed. R. Civ. P. 56(f) continuance is **DENIED** as moot in that additional discovery is not necessary to resolve the issues which have been resolved as a matter of law.

festly unjust; or (3) there has been an intervening change in controlling law. *Dixon v. Wallowa County,* 336 F.3d 1013, 1022 (9th Cir.2003).

## A. Extrinsic Evidence

In its August 10, 2010 "Order Re Summary Judgment Motions Re Qualified Pollution Exclusion Clause" (Ct.Rec.516), this court found as a matter of law that there is no conflict between B.C. law and Washington law and therefore, Washington law applies which holds that on its face, the term "sudden" in the qualified pollution exclusion clause at issue here is ambiguous and as such, does not contain a temporal element distinct from the terms "unexpected and unintended." *Queen City Farms, Inc. v. Central National Insurance Company of Omaha,* 126 Wash.2d 50, 82, 882 P.2d 703 (1994). This court also recognized, however, that extrinsic evidence could potentially resolve the ambiguity and establish that the parties mutually understood the term to mean temporal abruptness. This court found the extrinsic evidence offered by LMI related only to Teck's unilateral or subjective purposes and intentions regarding the term "sudden" and under Washington law, was insufficient to resolve the ambiguity. This court held that "what is necessary is ... extrinsic evidence of the parties' mutual intent which, in the insurance context, arises from actual mutual negotiations that took place between them" and LMI had not yet presented such evidence.

LMI contend the court erred in so holding because the Washington Supreme Court in *Lynott v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 123 Wash.2d 678, 871 P.2d 146 (1994), did not purport to hold that extrinsic evidence is always inadmissible to interpret a term that was not specifically negotiated. According to LMI, even if the parties did not negotiate the term "sudden," if there is extrinsic evidence establishing they nonetheless both mutually understood the term to mean temporal abruptness, that is how the term should be interpreted.

Under the "context rule," the intent of contracting parties cannot be determined without examining the context surrounding the execution of an instrument. *Hearst Communications, Inc. v. Seattle Times Co.,* 154 Wash.2d 493, 502, 115 P.3d 262 (2005). If relevant for determining mutual intent, extrinsic evidence may include: (1) the subject matter and objective of the contract; (2) all the circumstances surrounding the making of the contract; (3) the subsequent acts and conduct of the parties; and (4) the reasonableness of respective interpretations urged by the parties. *Id.,* citing *Berg v. Hudesman,* 115 Wash.2d 657, 667, 801 P.2d 222 (1990). See also *Tanner Electric Cooperative v. Puget Sound Power & Light Company,* 128 Wash.2d 656, 674, 911 P.2d 1301 (1996). Surrounding circumstances and other extrinsic evidence are to be used "to determine the meaning of specific words and terms used" and not to "show an intention independent of the instrument" or to "vary, contradict, or modify the written word." *Id.* at 503, 911 P.2d 1301, quoting *Hollis v. Garwall, Inc.,* 137 Wash.2d 683, 695–96, 974 P.2d 836 (1999). Thus, admissible extrinsic evidence does not include evidence of a party's unilateral or subjective intent as to a contract's meaning. *Go2Net, Inc. v. C I Host, Inc.,* 115 Wash.App. 73, 60 P.3d 1245 (2003). Washington follows the objective manifestation theory of contracts pursuant to which an attempt is made to determine the intent of the parties by "focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst,* 154 Wash.2d at 503, 115 P.3d 262. Mutual intent may be established directly or by

inference, but any inference must be based exclusively on the parties' objective manifestations. *Go2Net,* 115 Wash.App. at 85, 60 P.3d 1245.

In *Queen City Farms,* the Washington Supreme Court observed that ambiguity in an insurance contract (policy) may be resolved through extrinsic evidence as to the parties' intent, but there was no such evidence in the record in that case. 126 Wn.2d at 82, 882 P.2d 703. The court added that "[m]oreover, while evidence of the parties' mutual intent may be helpful in some contexts, we have recognized that sometimes language in standard policies does not involve mutual negotiations between the insurers and the insureds." *Id.* Left with an ambiguity in a non-negotiated standard form insurance provision, the court construed the ambiguity in the pollution exclusion against the drafter-insurer, and in accord with a reasonable interpretation of the policy. *Id.* at 83, 882 P.2d 703. The court then went on to consider the reasonableness of the interpretation offered by Queen City Farms in resolving the ambiguity and concluded that "sudden" means "unexpected" in the context of CGL policies containing the qualified pollution exclusion and therefore, "sudden and accidental" means "unexpected and unintended." *Id.* at 83–92, 882 P.2d 703. It appears that although the *Queen City Farms* court concluded there was no extrinsic evidence in the record, the reasonableness of the interpretation urged by Queen City Farms was relevant extrinsic evidence of mutual intent considered by the court. In sum, this court concludes that it read *Queen City Farms* too narrowly as holding

that in the insurance policy context, evidence of the parties' mutual intent is not helpful in the absence of actual mutual negotiations between the insurer and the insured.[1]

That said, the court is still not persuaded the extrinsic evidence relied upon by LMI thus far (that cited in its June 23 reply brief, Ct. Rec. 455 at pp. 5–11, 882 P.2d 703) is relevant evidence of an objective manifestation of the parties' mutual intent with regard to interpretation of the term "sudden" in the pollution exclusion clause. It may still at best constitute Teck's "[u]nilateral **or** subjective purposes and intentions" about the meaning of the term "sudden." *Lynott,* 123 Wash.2d at 684, 871 P.2d 146 (emphasis added). Intent is determined by the objective manifestations of the agreement rather than subjective intent of either party. *Max L. Wells Trust by Horning v. Grand Cent. Sauna & Hot Tub Co. of Seattle,* 62 Wash. App. 593, 602, 815 P.2d 284 (1991). Although LMI assert it was their understanding at the time of contracting with Teck that the term "sudden" meant temporally abrupt, it does not appear LMI have presented any extrinsic evidence establishing this was LMIs' understanding. Thus far, it appears LMI have relied solely on the language of the pollution exclusion clause and certain exchanges between Teck and Teck's insurance broker. In addition to there being no extrinsic evidence indicating negotiation of the term between Teck and LMI, there is no evidence of any discussion or correspondence between them regarding the term "sudden" at the time of contracting.[2]

---

1. Further review of *Lynott* indicates the court there considered other asserted and possible "objective manifestations" of mutual intent beyond the discussions between the insurance company's underwriter and an officer of the insurance broker. 123 Wash.2d at 688–89, 871 P.2d 146. The court found, however,

that none of this other extrinsic evidence was relevant to show mutual intent.

2. At this juncture, the court is not certain that separate subjective understandings by each party as to the term "sudden," even if the understandings are the same, would consti-

Discovery has occurred since this court issued its summary judgment order on August 10, and discovery continues to take place. There may be additional extrinsic evidence for the court's consideration. Furthermore, the court will not, at this time, make a final ruling on the relevancy of the existing extrinsic evidence.[3] The parties may file dispositive motions regarding the relevance of any and all extrinsic evidence developed regarding the meaning of the term "sudden." It is possible that determination will have to be made during trial if it cannot be made as a matter of law at summary judgment because relevant extrinsic evidence offered does not allow for the drawing of only one reasonable inference with regard to interpretation of the term "sudden." *Tanner*, 128 Wash.2d at 674, 911 P.2d 1301.

The court reconsiders and modifies its summary judgment ruling to the extent that relevant extrinsic evidence is not limited to evidence of actual mutual negotiation of the term "sudden" in the pollution exclusion clause.

## B. Relevant Happening

Defendants contend it is too early for the court to rule as a matter of law, as it did in its "Order Re Summary Judgment Motions Re Qualified Pollution Exclusion Clause," that the relevant "happening" under the terms of the policies is "the actual or threatened releases of hazardous substances from slag ('in both liquid and solid form') that settled in the UCR Site in the United States." (Ct. Rec. 516 at p. 8, 911 P.2d 1301). At the outset, the court notes this seems at odds with Defendants' position, expressed in their cross-motion for summary judgment, that the court should find as a matter of law the relevant "happening" was the initial discharge from the Trail smelter, that this was not "unintended or unexpected," and therefore that the pollution exclusion clause applies.

The plain language of the policies indicates the relevant "happening" is one which gives rise to liability. The underlying case, *Pakootas*, is a CERCLA case. The court acknowledges that Teck's CERCLA actual liability, as imposed by the law, has yet to be established and that is why in its order, it spoke only in terms of "potential" liability. (Ct. Rec. 516 at pp. 7–10). Nonetheless, the Ninth Circuit's decision in *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066 (9th Cir.2006), clearly establishes the boundaries of any actual CERCLA liability on the part of Teck. There must be a release or threatened release of hazardous substances within the United States in order to give rise to such liability. *Id.* at 1077. "Arranging for disposal of such substances, in and of itself, does not trigger CERCLA liability, nor does actual disposal of hazardous substances." *Id.* By itself, the disposal of hazardous substances at the Trail Smelter, does not create CERCLA liability and therefore, by itself, cannot be the relevant "happening" under the policies which re-

---

tute relevant extrinsic evidence of an objective manifestation of mutual intent by the parties as to the meaning of the term. The unpublished decision of the Washington Court of Appeals in *Olympic Pipe Line Company v. Pacific Employers Insurance Company*, 128 Wash.App. 1003, 2005 WL 1406125 (Wash. App. Div. 1 2005) is without precedential value per RCW 2.06.040. If it is without precedential value to Washington courts regarding application of Washington law, it is of no

precedential value to this federal court in applying Washington law. Indeed, per this court's Local Rules, LR 7.1(g)(2), the decision should not have been cited because it was filed prior to January 1, 2007.

**3.** Because the evidence was presented for the first time in LMIs' reply brief, Teck did not have an opportunity to address it in its own written brief.

sults in liability. As this court stated in its order, however, the disposal nonetheless has potential relevance to whether the "happening" resulting in liability (the release or threatened release of hazardous substances) was "unintended and unexpected." (Ct. Rec. 516 at pp. 9–10).

Additional discovery and investigation will not alter what constitutes the relevant "happening." Additional discovery and investigation will assist in answering what was "unintended and unexpected" on the part of Teck. This court did not clearly err in ruling as a matter of law that the relevant "happening" under the terms of the policies is "the actual or threatened releases of hazardous substances from slag ('in both liquid and solid form') that settled in the UCR Site in the United States." Furthermore, the court did not clearly err in denying Defendants' request for a Rule 56(f) continuance with regard to this particular issue.

### C. Denial Of Rule 56(f) Continuance

This court did not clearly err, or cause a manifest injustice to Defendants, in declining to stay ruling on Plaintiff's motions for summary judgment pending completion of additional discovery. All of this court's summary judgment rulings were based either on pure questions of law (i.e., existence of conflict between B.C. law and Washington law), and/or on undisputed language in the policies, and/or other undisputed documentary evidence, and/or prior court orders. That the issues the court resolved as a matter of law were ripe for resolution is confirmed by the fact Defendants also moved for summary judgment on each of those issues.

Defendants assert ongoing discovery is "virtually certain to result in evidence that is highly relevant to 'damages,' scope of coverage and choice of law issues." Although this court appropriately found as a matter of law, based on undisputed language in the policies, that an "all sums" approach governs the scope of coverage, it recognized application of that approach remains to be resolved. Discovery may be helpful in that regard. Defendants assert they anticipate taking depositions that "likely will shed light on the parties' expectations as to which country's laws would apply to the insurance contracts." Even assuming such evidence is developed, it has no potential for altering the court's threshold determination that there is no conflict between B.C. law and Washington law on scope of coverage and interpretation of the qualified pollution exclusion clause. The parties' expectations are relevant to a choice of law analysis and there is no choice of law issue when there is no conflict in the first instance. This court appropriately found as a matter of law that the RI/FS costs fall within the meaning of "damages" contained in the policies. Whether Defendants have a duty to indemnify Plaintiff under the terms of the policies remains an open question as to which discovery will presumably shed some light. The damages which are in fact recoverable remains very much an issue.

## II. CLARIFICATION

### A. Choice of Law

The court sees no need to clarify its choice of law analysis. It provided a full ten page analysis in its "Order Re Summary Judgment Motions Re Scope Of Coverage" (Ct. Rec. 515 at pp. 15–25) and adequately addressed the factors set forth in the Restatement §§ 6 and 188. That analysis also applies to interpretation of the qualified pollution exclusion clause.

### B. Existence Of Conflict Of Law

As the court stated in its summary judgment orders re scope of coverage and the

qualified pollution exclusion clause, in order to find there is a conflict between B.C. law and Washington law, there must be "sufficient proof to establish with reasonable certainty the substance of foreign principles of law." (Ct. Rec. 515 at p. 5; Ct. Rec. 516 at pp. 2–3). Although this court pointed out the absence of any authoritative binding decisions in B.C., or Canada as a whole, regarding scope of coverage and the qualified pollution exclusion clause, it also specifically found it was not "reasonably certain" a B.C. court or the Supreme Court of Canada would arrive at conclusions on those issues which conflict with Washington law. (Ct. Rec. 515 at p. 14; Ct. Rec. 516 at p. 4). This court did not employ an "absolute certainty" standard. Had it done so, it would have been unnecessary to devote a cumulative thirteen pages to analyzing whether there was a conflict of law (Ct. Rec. 515 at pp. 4–14; Ct. Rec. 516 at pp. 2–4).

### C. Risk In The Upper Columbia River

The LMI policies provide coverage for multiple locations of risk, including the Upper Columbia River (UCR) in Washington. This finding was made in conjunction with the court's choice of law analysis and specifically, its consideration of the reasonable expectation of the parties as to whether Washington law might apply to interpretation of the policies. Obviously, whether there is actual coverage for damages incurred by Teck at that location of risk is a question to be resolved at a later date.

### D. Wrongful Action

LMI noted that the Supreme Court of Canada, in affirming denial of Teck's application to have British Columbia courts decline jurisdiction over this insurance coverage dispute, reasoned that "Teck's alleged wrongful actions occurred solely in Canada . . . ." This court concluded the U.S. Court of Appeals for the Ninth Circuit had "effectively found" to the contrary that "Teck's alleged wrongful actions occurred in the United States by virtue of hazardous elements being released from slag discharged by Teck in Trail, B.C., and coming to rest within the UCR in the United States." (Ct. Rec. 515 at pp. 15–16). In its choice of law analysis, this court concluded "[a]s legitimate an expectation by the insured, and the insurers for that matter, is that Washington law might apply to policies insuring risk worldwide where the alleged wrongful action and the alleged damage occurred in Washington, only a few miles from the Trail smelting operation." (Ct. Rec. 515 at pp. 24–25).

LMI assert the Ninth Circuit used the alleged "release" in Washington as a jurisdictional hook for CERCLA liability, but did not suggest the alleged "release" involved any "wrongful action" by Teck within Washington. Even assuming there was no "wrongful action" by Teck within Washington, this would not alter the court's choice of law analysis since there is no question the alleged damage occurred in Washington. Therefore, it was foreseeable that Teck would face potential liability in Washington and the parties could reasonably expect that Washington law might apply to interpretation of the insurance policies. As Teck's CERCLA liability, as imposed by the law, has yet to be determined, it remains possible Teck may yet be found to have engaged in some "wrongful action" in Washington.

### E. *Canron*

In its choice of law analysis in its "Order Re Motions For Summary Judgment Re Scope Of Coverage," this court noted with regard to the *Canron* decision by the Washington Court of Appeals:

In *Canron*, the court concluded "British Columbia would best be considered the location of the subject matter in relation to this case," even though the contaminated site at issue was in Kent, Washington. Thus, the argument can be made in the instant case that "the location of the subject matter" is Teck's smelting operation in Trail, B.C. That argument would carry more heft if the Ninth Circuit had agreed with Judge McDonald that the "releases" at issue were from the Trail plant and that an extraterritorial application of CERCLA was necessary and permissible. The Ninth Circuit did not agree. It found the "releases" occurred in Washington in the Upper Columbia River site when harmful elements were released from slag which had been discharged from the Trail plant and eventually settled in the Upper Columbia River site.

(Ct. Rec. 515 at p..23).

Defendants contend *Canron* is indistinguishable from the case at bar because *Canron* also involved a CERCLA-defined "release" within Washington, but the Washington Court of Appeals still held that British Columbia would best be considered the location of the subject matter of the insurance contracts. According to the *Canron* court: "[T]he parties understood the contracts covered multiple risks in multiple locations, including the galvanizing plant in British Columbia. The plant's wastes were shipped from British Columbia. British Columbia would best be considered the location of the subject matter **in relation to this case** ...." 82 Wash.App. at 493–94, 918 P.2d 937 (emphasis added).

The *Canron* court apparently considered the B.C. galvanizing plant in that case to be the subject matter of the insurance contracts, although it must be noted it did not have to make such a ruling because

neither of the parties argued for the application of B.C. law. *Id.* at 494, 918 P.2d 937. This court is aware of no authority dictating that the location of the "subject matter" of an insurance contract must necessarily be the physical plant that initially created the hazardous waste itself, or that initially created the substance that eventually caused the release of hazardous waste. To this court, it makes just as much sense to conclude the "subject matter" is the risk and the alleged pollution damage which give rise to the particular liability at issue and for which insurance coverage is claimed. Here, the location of the risk and the alleged damage is the UCR Site in Washington. It is the "release" of hazardous substances which gives rise to potential CERCLA liability on the part of Teck and for which it seeks insurance coverage. As this court noted, the LMI policies insure multiple principal locations of risk and indeed, provide worldwide coverage. (Ct. Rec. 515 at pp. 18–19, 918 P.2d 937; 22). As this court also noted, the location of the "subject matter" is but one factor in the choice of law analysis and indeed, notwithstanding its finding that the B.C. galvanizing plant constituted the location of the "subject matter" in *Canron*, the Washington Court of Appeals concluded Washington law applied because it had "a paramount interest in the health and safety of its people." 82 Wash.App. at 494, 918 P.2d 937.

### F. Washington's Interest

The purpose of the RI/FS is to investigate the extent of the contamination at the UCR Site and to determine what is the best remedy for cleaning up the same. Under CERCLA, the investigation is a prerequisite to remediation. They are part and parcel of the same process. Thus, as in *Canron:*

Washington bears the responsibility under CERCLA for ensuring the site cleanup and will bear the burden if the site is not cleaned' The existence or absence of insurance proceeds can determine whether or not a hazardous waste site is remediated. Washington, therefore, has a significant interest in [Teck's] insurance coverage.

*Id.* at 494, 918 P.2d 937.

### G. Location Of The Contaminated Site

Defendants contend that for all intents and purposes, this court found the location of the contaminated site (Washington) controls the outcome of the choice of law analysis. Defendants assert the court unfairly gave more weight to the location of the contaminated site "and less weight to other important factors such as the fact that the subject matter of the risk (the Trail smelter) which is alleged to be the primary source of contamination, is located in British Columbia." This court did not find that the "subject matter of the risk" is the Trail Smelter. It found the "subject matter of the risk" is the release of hazardous substances from slag located in the UCR Site. (Ct. Rec. 515 at p. 23, 918 P.2d 937; and discussion *supra* regarding *Canron*). And while the court noted this is "first and foremost an insurance coverage dispute between the parties" and the " 'performance' at issue is the performance of insurance contract obligations," it also noted that the "location of the subject matter of the policies extends beyond B.C. and includes sites in Washington and elsewhere." (*Id.* at p. 24, 918 P.2d 937). Although the majority of Teck's operations are in B.C., "it was understood by Teck and LMI that those operations created risks of liability beyond the borders of B.C. and thus, the policies were created to cover those risks." (*Id.*). Even though this court found there is no conflict between B.C. law and Washington law, it engaged in a choice of law analysis. This court considered all of the factors relevant to that analysis and concluded they weighed in favor of applying Washington law.

### H. RI/FS Costs Unrelated To "Releases" From Slag

LMI ask the court to clarify it has not ruled that RI/FS costs related to non-slag contamination, if any, are "damages" under the policies, considering the court concluded the relevant "happening" is "the actual or threatened releases of hazardous substances from slag ("in both liquid and solid form") that settled in the UCR Site in the United States." The court found this to be the relevant "happening" because it is these releases which give rise to potential liability under CERCLA.

This is not an issue which was specifically presented to the court on summary judgment. The court's relevant "happening" determination occurred in conjunction with its ruling on the summary judgment motions related to the qualified pollution exclusion clause. (Ct. Rec. 516 at pp. 8–9, 918 P.2d 937). In a separate order, the court ruled as a matter of law that RI/FS costs incurred by Teck pursuant to its Settlement Agreement with EPA constitute "damages" as that term is used in the policies. This court found Teck has a legal obligation to pay RI/FS costs by reason of liability assumed under the EPA Settlement Agreement for a property damage claim (as opposed to liability imposed by law). Teck acknowledged it was not requesting a ruling that LMI have a present duty to indemnify Teck, and this court made no ruling with regard to indemnification. (Ct. Rec. 517 at p. 13, 918 P.2d 937). The duty to indemnify hinges on the insured's actual liability to the claimant and actual coverage under the policy. *Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wash.2d 55, 64, 1 P.3d 1167 (2000). While Teck's liability for RI/FS costs has been

established pursuant to the EPA Settlement Agreement, this court has not relieved Teck of its burden to demonstrate coverage. Accordingly, whether the RI/FS costs for which Teck has assumed liability under the EPA Settlement Agreement are covered under the LMI policies and therefore, subject to indemnification, will be resolved at a later date.[4]

## III. CONCLUSION

Defendants' Motion For Reconsideration And/Or Clarification (Ct.Rec.536) is **GRANTED in part** and **DENIED in part** as set forth above.

**IT IS SO ORDERED.** The District Executive is directed to enter this order and forward copies to counsel.

---

4. In its "Order Re Summary Judgment Motions Re Environmental Response Costs As 'Damages'," in the section addressing whether RI/FS costs are "on account" of "property damage," (Ct. Rec. 517 at p. 11), this court noted:

"Property Damage" must be "caused by or aris[e] out of each occurrence happening anywhere in the world." Teck acknowledges that whether there has been an "occurrence" is a question for a later time and is not something it seeks to resolve now on summary judgment. Whether there was a qualifying "occurrence" depends on whether there was a "happening" which "unexpectedly and unintentionally" resulted in property damage. The question for future resolution is whether, assuming there was property damage, Teck did not expect or intend the same to occur from any activity for which it is responsible.